# EXHIBIT 1

Case 8:13-cv-02577-RAL-TGW   Document 70-1   Filed 01/05/15   Page 2 of 30 PageID 1087

ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
1—4

## Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION
                  CASE NO. 13-cv-02577-RAL-TGW
 3
    TRAVELERS CASUALTY AND SURETY
 4  COMPANY OF AMERICA,

 5       Plaintiff,

 6  vs.

 7  MADER LAW GROUP, LLC, ERIC A. MADER,
    and SEAN BATCHELER,
 8
         Defendants.
 9  _____/

10

11       30(b)(6) DEPOSITION OF MADER LAW GROUP, LLC
              DESIGNEE:  ERIC A. MADER
12           Taken By Counsel for Plaintiff
                   (Pages 1 - 113)
13

14               Tuesday, July 8, 2014
                 9:06 a.m. - 11:50 a.m.
15

16

17          Cole, Scott & Kissane, P.A.
            4301 West Boy Scout Boulevard
18                    Suite 400
                  Tampa, Florida
19

20

21

22
    Reported By:
23  Jennifer Figueroa, RPR
    Notary Public, State of Florida at Large
24  Esquire Deposition Solutions - Tampa Office
    Phone - 813.221.2535, 800.838.2814
25  Esquire Job No. 158470
```

## Page 2

```
 1  APPEARANCES:

 2       LINDSAY P. LOLLIO, ESQUIRE
         Aronberg Goldgehn Davis & Garmisa
 3       330 North Wabash Avenue
         Suite 1700
 4       Chicago, Illinois 60611-3586
         llollio@agdglaw.com
 5
               On Behalf of the Plaintiff
 6

 7

 8       H. VANCE SMITH, ESQUIRE
         Kadyk & Delesie, P.A.
 9       102 West Whiting Street
         Suite 601
10       Tampa, Florida 33602
         vsmith@kdelegal.com
11
               On Behalf of Defendants
12             Mader Law Group, LLC, and Eric A. Mader

13

14

15

16

17

18                 I N D E X

19                                            PAGE

20  Direct Examination by Ms. Lollio            4

21  Errata Sheets                          109-111

22  Certificate of Reporter                    112

23  Certificate of Oath                        113

24

25
```

## Page 3

```
 1                    EXHIBITS
 2  NO.         DESCRIPTION                        PAGE

 3   1    Re-notice of deposition pursuant to Rule
          30(b)(6)                                   6
 4
     2    Petition for permanent injunction,
 5        restitution, civil penalties, and other
          court orders                              26
 6
     3    Consumer complaints made against Mader Law
 7        Group with the Missouri Attorney General  31

 8   4    Notices of complaints made against Eric
          Mader                                     33
 9
     5    E-mail from Eric A. Mader to Robby
10        Birnbaum dated 3/8/12                     36

11   6    Notices of findings of probable cause for
          future disciplinary proceedings          38
12
     7    The Florida Bar complaint                 43
13
     8    Document entitled "Better Business
14        Bureau review"                            47

15   9    Applications for registration of
          fictitious names                          54
16
    10    Policy application for professional
17        liability coverage                        60

18  11    Florida Attorney General complaint made
          against Mader Law Group                   91
19
    12    Summons and complaint filed by Marc Rowe
20        and Tasha Rowe against Mader Law Group
          and Eric Mader                            98
21
    13    Letter to Eric A. Mader and Mader Law
22        Group from Karin Kruidenier on behalf of
          Travelers dated 10/4/13                  100
23
    14    Responses to Plaintiff's first request
24        for production of documents to Defendants 102

25
```

## Page 4

```
 1        Deposition taken before Jennifer Figueroa,
 2  Registered Professional Reporter and Notary Public in
 3  and for the State of Florida at Large, in the above
 4  cause.
 5            *    *    *    *    *
 6        THE COURT REPORTER:  Do you swear or affirm
 7  that the testimony you're about to give will be the
 8  truth, the whole truth, and nothing but the truth?
 9        THE WITNESS:  Yes.
10        THE COURT REPORTER:  Thank you.
11             ERIC A. MADER,
12  having been first duly sworn or affirmed, was examined
13  and testified as follows:
14             DIRECT EXAMINATION
15  BY MS. LOLLIO:
16      Q.   Let the record reflect that this is the
17  30(b)(6) deposition of Mader Law Group, LLC, law firm
18  taken pursuant to notice and also the provisions of the
19  Federal Rules Of Civil Procedure and the local rules of
20  the Middle District of Florida.
21        Sir, can you please state your name for the
22  record?
23      A.   Sure.  Eric Mader.  Eric A. Mader, I'm sorry.
24        MR. SMITH:  Excuse me for a moment.
25        MS. LOLLIO:  Sure.
```



800.211.DEPO (3376)
EsquireSolutions.com

ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014

5—8

Page 5

1      MR. SMITH:  You've noticed the 30(b)(6)
2  deposition as well as the individual's
3  deposition --
4      MS. LOLLIO:  Correct.
5      MR. SMITH:  -- who are one and the same.  Can
6  you tell me, do you intend to go through the law
7  group and then Mr. Madder individually, or can we
8  combine those?
9      MS. LOLLIO:  To the extent that his testimony
10  today is based on his personal knowledge, and that
11  his testimony is on behalf of Mader Law Group,
12  if -- depending how the testimony goes, if we can
13  stipulate that any of your answers based on your
14  personal knowledge today will stand as to any
15  questions posed to you during your personal
16  deposition, we can take it up at the end of the
17  deposition.
18      MR. SMITH:  That's fine.  I've instructed him
19  when and if possible to say, "I'm answering on
20  behalf of the law group and not myself."
21      MS. LOLLIO:  Okay.  All right.  That works.
22  All right.
23  BY MS. LOLLIO:
24      Q.  So, Mr. Mader, as you sit here today, you are
25  designated as the witness in response to the Rule

Page 6

1  30(b)(6) deposition notice that was served on Mader Law
2  Group.  Correct?
3      A.  Correct.
4      Q.  Let me show you what's --
5      MS. LOLLIO:  Can we mark this, please?
6      (Exhibit 1 marked for identification.)
7      MS. LOLLIO:  Thank you.
8  BY MS. LOLLIO:
9      Q.  Let me show you what's been marked as Mader
10  Exhibit No. 1.  This is the re-notice of deposition
11  pursuant to Rule 30(b)(6).  It lists several categories
12  of topics of deposition testimony on Pages 4 and 5.  Are
13  you designated as the witness to testify on behalf of
14  Mader Law Group on behalf of all of the subjects that
15  are listed on Pages 4 and 5?
16      A.  Yes.
17      Q.  Okay.  Mr. Mader, where do you currently
18  live?
19      A.  3710 West San Luis, Tampa, Florida.
20      Q.  West St. Louis?
21      A.  San Luis.
22      Q.  San Luis?
23      A.  Yep.
24      Q.  And how long have you lived there?
25      A.  Ten-plus years.

Page 7

1      Q.  Do you have any plans to move in the near
2  future?
3      A.  Maybe.
4      Q.  And how strong is that "maybe"?
5      A.  I don't know.
6      Q.  As of right now, you don't have any plans to
7  move at this time?
8      A.  There are -- things are under consideration.
9      Q.  Do you plan to move from the state of
10  Florida?
11      A.  Maybe.
12      Q.  All right.  Can you please tell me the extent
13  of your education?
14      A.  I have an industrial-engineering degree from
15  Clemson University and a law degree from Florida State
16  University.
17      Q.  When did you receive your
18  industrial-engineering degree from Clemson?
19      A.  '90.
20      Q.  When did you receive your law degree?
21      A.  '95.
22      Q.  All right.  Do you have any advanced law
23  degrees, such as an LLM?
24      A.  (Moves head from side to side.)
25      Q.  Do you have any additional degrees?

Page 8

1      A.  No.
2      Q.  What is your current position at Mader Law
3  Group?
4      A.  There isn't one.  I dissolved the firm.
5      Q.  When did you dissolve the firm?
6      A.  Couple of months ago -- month ago.
7      Q.  Do you have a date?
8      A.  Not -- about a month ago.
9      Q.  One month ago from today.  Probably sometime
10  in early June, 2014?
11      A.  Yeah.
12      Q.  At the time that you dissolved the firm, what
13  was your position at Mader Law Group?
14      A.  Managing partner, I guess.
15      Q.  Managing partner.  And how long did you hold
16  that position?
17      A.  The length of the corporation's formation.
18      Q.  When was the corporation formed?
19      A.  I guess in 2012 -- '11 or '10.
20      Q.  So from the inception of the firm till the
21  time that you dissolved it, approximately a month ago,
22  you were the managing partner of the office -- of Mader
23  Law Group?
24      A.  As much as there was anything going on with
25  the firm, yes.



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
9–12

Page 9

1    Q.   What were your duties as managing partner of
2    Mader Law Group?
3    A.   Overseeing any of the legal work that came
4    through.
5    Q.   Can you explain to me what that means?
6    A.   If we had a client, we -- and I didn't handle
7    the work myself personally, we'd have somebody -- staff
8    take care of work.
9    Q.   Did you have any administrative duties?
10   A.   Minimal, depending on what, you know -- I
11   handled what I needed to handle, if I could handle it.
12   Q.   Did you have any other duties as managing
13   partner of Mader Law Group?
14   A.   Just run -- trying to run the business, trying
15   to run the firm.
16   Q.   At any point from the firm's inception until
17   the time you dissolved it approximately a month ago, did
18   you hold any other positions at Mader Law Group?
19   A.   No.
20   Q.   So your title as of January 2013 was managing
21   partner?
22   A.   Yeah.
23   Q.   Mader Law Group is a limited liability
24   company -- or was a limited liability company?
25   A.   Yes.

Page 10

1    Q.   Did you have any equity interest in that
2    company?
3    A.   No.
4    Q.   Prior to the dissolution of the firm, were
5    there any other partners in the firm?
6    A.   No.
7    Q.   Never, since the point of inception?
8    A.   No.
9    Q.   Did you do anything in connection with your
10   deposition today -- I'm sorry.  Did you do anything in
11   preparation for your deposition today as a Rule 30(b)(6)
12   witness on behalf of Mader Law Group?
13   A.   Specifically?
14   Q.   Did you review the deposition notice that we
15   previously marked as Mader Exhibit No. 1?
16   A.   I don't think I looked at this one
17   specifically until just now.
18   Q.   And you did not review the deposition topics
19   prior to today's deposition?
20   A.   No, I don't think I did.
21   Q.   Did you review any documents in preparation
22   for today's deposition?
23   A.   Just the affirmative defenses and response.
24   Q.   And these are the affirmative defenses of
25   Mader Law Group and --

Page 11

1    A.   Yes.
2    Q.   -- Eric Mader individually?
3    A.   Yes.
4    Q.   Did you review anything else?
5    A.   No.
6    Q.   All right.  Did you bring any documents with
7    you today?
8    A.   No.
9    Q.   Other than your attorney, did you speak with
10   anyone in preparation for your deposition as a 30(b)(6)
11   witness today?
12   A.   No.
13   Q.   How about as an individual witness?
14   A.   No.
15   Q.   Will your testimony today on the topics listed
16   in the 30(b)(6) re-notice of deposition, which we've
17   previously marked as Mader No. 1, be based on your
18   knowledge, including your personal knowledge, of the
19   subject areas; as opposed to any information you've
20   recently gained from others or from documents other than
21   the affirmative defenses?
22   A.   I think the answer's yes.
23   Q.   Prior to dissolution of Mader Law Group, were
24   there any other attorneys employed at the firm?
25   A.   Yes.

Page 12

1    Q.   And who are they?
2    A.   John Mitchell.
3    Q.   Was he employed by the firm at the time it was
4    dissolved?
5    A.   No.
6    Q.   How long was he employed with the firm?
7    A.   Up until probably October of last year.
8    Q.   October of 2013?
9    A.   Yeah.
10   Q.   When did he begin employment with Mader Law
11   Group?
12   A.   I don't know.
13   Q.   Was he --
14   A.   I don't know the date.
15   Q.   Was he there at the time that the firm
16   started?
17   A.   No.
18   Q.   Generally --
19   A.   I don't think so.  I don't think so.
20   Q.   And what was his title?
21   A.   Just attorney.
22   Q.   Attorney.  No other designation, such as
23   associate?
24   A.   No.
25   Q.   Were there any other attorneys employed by



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
13—16

Page 13

1   Mader Law Group prior to the dissolution of the firm?
2       A.   Shawn Packer.
3       Q.   Shawn Packer.  Was he employed by the firm at
4   the time it was dissolved?
5       A.   No.
6       Q.   What were his dates of employment generally,
7   if you don't remember specific dates?
8       A.   He's been gone a couple of years, so I don't
9   know.
10      Q.   Was he employed with the firm as of January
11  2013?
12      A.   No.
13      Q.   Was he --
14      A.   I don't think so.
15      Q.   Are there any other attorneys that were
16  employed by Mader Law Group prior to the firm being
17  dissolved?
18      A.   Olivia Soden.
19      Q.   Can you spell that last name?
20      A.   S-o-d-e-n.
21      Q.   Do you recall the dates of her employment with
22  the firm?
23      A.   No, I don't.
24      Q.   Let me back up.  Shawn Packer, what was his
25  title?

Page 14

1       A.   Attorney.
2       Q.   Same with Olivia Soden?
3       A.   Yeah.
4       Q.   Any other attorneys that were employed by
5   Mader Law Group?
6       A.   I don't think so.
7       Q.   Does Mader -- or did Mader Law Group have any
8   officers?
9       A.   No.
10      Q.   Did anyone have any ownership interest in the
11  firm?
12      A.   No.
13      Q.   Other than attorneys, was there anyone else
14  employed by Mader Law Group?
15      A.   Yes.
16      Q.   Can you tell me who?
17      A.   Shannon Hammer.
18      Q.   Shannon Hammer?
19      A.   Yeah.
20      Q.   What was her title?
21      A.   Paralegal.
22      Q.   When was she employed by the firm?
23      A.   Through October of last year.
24      Q.   October of 2013?
25      A.   Yeah.

Page 15

1       Q.   What were Ms. Hammer's duties and
2   responsibilities as paralegal for Mader Law Group?
3       A.   Paralegal duties related to whatever legal
4   work came through.
5       Q.   Can you give me a description of what those
6   duties included?
7       A.   No, not -- that's what it was.
8       Q.   Any other individuals other than attorneys who
9   are employed by Mader Law Group at any time?
10      A.   Well, there was a whole group of people that
11  were employed out of the West Palm office that -- I
12  couldn't give you those names for the life of me,
13  without looking through everything.
14      Q.   Do you recall any names of any individuals
15  that were employed out of the West Palm office?
16      A.   Rachelle Polis.
17      Q.   Rachelle Polis?
18      A.   Yeah.
19      Q.   Can you spell that last name?
20      A.   P-o-l-i-s.
21      Q.   What was her title?
22      A.   She was a paralegal.
23      Q.   And what were her duties as paralegal for
24  Mader Law Group?
25      A.   Same.

Page 16

1       Q.   Same as Ms. Hammer's?
2       A.   Yeah.
3       Q.   Do you recall her dates of employment?
4       A.   No.
5       Q.   Other than Ms. Hammer and Ms. Polis, can you
6   name any other --
7       A.   Sean Batcheler.
8       Q.   Sean Batcheler?
9       A.   Yeah.
10      Q.   What was his title?
11      A.   Basically office manager.  I didn't give him a
12  specific title.
13      Q.   But you would describe it as the "office
14  manager" based on his duties and responsibilities?
15      A.   Yes.
16      Q.   What type of things did he handle?
17      A.   He oversaw the files as they came through,
18  the -- he did the -- he set up the office and handled
19  some of the hiring, et cetera, for that office.
20      Q.   When you say he "oversaw files as they came
21  through," was that similar to the duties you had as
22  managing partner for the firm?
23      A.   No.
24      Q.   And does Mr. Batcheler have a law degree?
25      A.   No.



Page 17

1    Q.  All right.  Other than these three
2    individuals, can you name anyone else other -- that was
3    employed by the firm who is not an attorney?
4    A.  There were more, but I can't give you a list
5    of any names off the top of my head.
6    Q.  Right now?
7    A.  Yeah.
8    Q.  Was Ms. Hammer the only non-attorney who was
9    employed by Mader Law Group that was not based in the
10   West Palm office?
11   A.  Actually, we had Tim Jordan as well.
12   Q.  Tim Jordan was --
13   A.  Yeah, he was just a -- he handled the
14   collection work in the Tampa office.
15   Q.  He was not an attorney?
16   A.  No.
17   Q.  What was his title?
18   A.  Collections manager.
19   Q.  Collections manager?
20   A.  Yeah.
21   Q.  All right.  So only Ms. Hammer and Mr. Jordan
22   were the non-attorneys employed by Mader Law Group in
23   the Tampa office?
24   A.  Yes, that I can remember.
25   Q.  All other non-attorneys employed by Mader Law

Page 18

1    Group were based in the West Palm office?
2    A.  Yes.
3    Q.  At the time that the firm was dissolved, what
4    types of legal services did Mader Law Group provide?
5    A.  We did some foreclosure work, loan
6    modification, mortgage assistance, general contract
7    work, general legal work.
8    Q.  I apologize.  The second to last one was
9    "general contract work"?
10   A.  Yeah, contract work, that sort of thing.
11   Q.  All right.  I'll describe that as five
12   categories.  Those five categories of the legal services
13   that Mader Law Group provided at the time the firm was
14   dissolved, would you divide those categories in any --
15   or would you give them any percentage of the amount of
16   the legal services that Mader Law Group provided?
17   A.  I'm an attorney, not a mathematician.
18   Q.  Fine.  Just generally speaking, what
19   percentage of the services that Mader Law Group provided
20   was foreclosure work?
21   A.  Probably by that time it was pretty much very
22   minimal.
23   Q.  What was --
24   A.  I basically stopped doing all work within the
25   foreclosure, modification industry in January of last

Page 19

1    year.
2    Q.  January of 2013?
3    A.  '13, yeah.  I stopped taking any new clients
4    and closed out the remaining files that I had.
5    Q.  And that was just foreclosure work or also
6    loan modification?
7    A.  Yes, the latter.
8    Q.  As of January 2013, before you stopped taking
9    any of those files, what percentage of the legal
10   services that Mader Law Group provided were foreclosure
11   or loan modification?
12   A.  I don't even know.  I couldn't give you a
13   number --
14   Q.  Would you say it was majority?
15   A.  No; it wasn't the majority, no.
16   Q.  At the time that the firm was dissolved, what
17   were the majority of the files that you had?  What type
18   of work were they?
19   A.  They were either commercial collections or
20   general contract work or some bankruptcy work; and then
21   the foreclosure, loan-mod files.
22   Q.  Did the attorneys at Mader Law Group
23   specialize in one area or the other?
24   A.  No.
25   Q.  What was your area of specialty?

Page 20

1    A.  I don't have one.
2    Q.  What was John Mitchell's area of specialty?
3    A.  He had general legal background, and he was
4    familiar with bankruptcy work.
5    Q.  What was Shawn Packer's background?
6    A.  He didn't have one.
7    Q.  Or, I'm sorry, specialty?
8    A.  He didn't have one.
9    Q.  How about Olivia Soden?
10   A.  Didn't have one.
11   Q.  Was the work at Mader Law Group divided up
12   among the attorneys based on area of practice?
13   A.  Well, John handled a little bit more of the
14   bankruptcy and the bankruptcy work, but that was the
15   only real division.  Olivia was based in West Palm, so
16   she was associated with those files.
17   Q.  And the West Palm office, did that provide
18   legal services that were different from the Tampa
19   office?
20   A.  Yeah.  I mean it was -- that office was
21   strictly foreclosure -- for foreclosure and
22   loan-modification work.  The Tampa office assisted with
23   foreclosure work and focused more on commercial
24   collections.
25   Q.  Did anyone in the Tampa office -- any of the



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
21–24

Page 21

1  attorneys in the Tampa office assist on any files that
2  originated out of the West Palm office?
3      A.  Yes.
4      Q.  So Olivia Soden is not the only attorney that
5  was handling loan-modification and foreclosure files in
6  the West Palm office?
7      A.  Yeah, I think that's accurate.
8      Q.  Did Mader Law Group provide the same type of
9  legal services that you previously identified prior to
10  2012?
11     A.  Such as?
12     Q.  Loan modification, foreclosure work,
13  collections, bankruptcy?
14     A.  All right.  I'm not following your timeline,
15  so ask the question, please, again.
16     Q.  So prior to 2012, was Mader Law Group
17  providing the same type of legal services?
18     A.  As 2013?
19     Q.  Prior to 2012.
20     A.  Prior to 2012 it was, again, commercial
21  collections, foreclosure work.
22     Q.  Is that it?
23     A.  The modifications, yeah, topic we just
24  discussed; bankruptcy.
25     Q.  And Mader Law Group provided the same type of

Page 22

1  legal services between 2012 and 2013?
2      A.  Yeah.
3      Q.  And it was only in January of 2013 that you
4  stopped doing loan modification or you cut down on your
5  loan modification and foreclosure work?
6      A.  Stopped taking any new files and closed out
7  the current files that we had.
8      Q.  During 2012 and 2013 were the gross billings
9  or revenues of Mader Law Group in areas other than
10  bankruptcy, collection/repossession, general corporate,
11  and labor-litigation defense?
12     A.  One more time, please?
13     Q.  Sure.  I'll break it down.  During 2012 and
14  2013 were the gross billings or revenues of Mader Law
15  Group in areas other than bankruptcy,
16  collections/repossession, general corporate, and
17  labor-litigation defense?
18     A.  And then obviously the foreclosure and
19  modification of loans.
20     Q.  Can you estimate during 2012 and 2013 the
21  firm's billings or revenues from foreclosure and
22  loan-modification work?
23     A.  No, I can't.
24     Q.  Do you consider foreclosure and
25  loan-modification work to be the same category of legal

Page 23

1  service?
2      A.  Depends.  Not really, no.  I mean there's --
3  they go hand-in-hand.
4      Q.  Do you consider them separate categories of
5  legal services, although they are similar?
6      A.  Separate but related, I guess.
7      Q.  And you consider loan -- or loan-modification
8  and foreclosure work to be separate from collection
9  work?
10     A.  Yes.
11     Q.  At the time of dissolution of the firm, what
12  was Mader Law Group's address?
13     A.  3902 Henderson Boulevard.
14     Q.  And that's in Tampa, Florida?
15     A.  Yeah.
16     Q.  At the time the firm was dissolved, was the
17  West Palm Beach office open?
18     A.  Well, no, but there were files there being --
19  well, actually the West Palm office -- when I was
20  dissolved?
21     Q.  Uh-huh.
22     A.  No.  There was -- I had to -- I guess I could
23  say I had about 20 files that were remaining that we
24  were closing out that were being handled out of that
25  office; but none of the employees -- there was no

Page 24

1  employees.  I didn't have any Mader employees over there
2  at that time.  In fact, I stopped having Mader employees
3  out of that office in middle to beginning of 2013 as
4  well, so ...
5      Q.  When you say "Mader employees," you're
6  referring to employees at Mader Law Group?
7      A.  Yes.
8      Q.  And when you say that you stopped having Mader
9  employees out of the West Palm office in January 2013
10  or --
11     A.  Somewhere -- it was in the beginning, first
12  quarter I think, of that year.
13     Q.  Does that include attorneys?
14     A.  Yes.
15     Q.  All right.  And the location of the West Palm
16  office, what was that address?
17     A.  Old Okeechobee Road.  I think it's 1800.
18     Q.  Is there a specific suite associated with that
19  address?
20     A.  No.
21     Q.  That's West Palm Beach, Florida?
22     A.  Yeah.
23     Q.  Has Mader Law Group always maintained an
24  office at the 3902 Henderson Boulevard address in
25  Tampa?



Page 25

A. No, not always.
Q. Okay. What other offices did Mader Law Group have?
A. We were out of 5010 West Carmen.
Q. That's in Tampa?
A. Yes.
Q. Any other offices?
A. No.
Q. At what time -- am I accurate in saying that at one point you moved Mader Law Group from the 5010 West Carmen office to the 3902 Henderson Boulevard office?
A. Yes.
MR. SMITH: Object to the form; assumes a fact not in evidence, that he moved from Carmen to Henderson. That may be not correct.
BY MS. LOLLIO:
Q. At the time that you opened Mader Law Group in 2009 or 2010, where did you maintain an office?
A. I had offices at 5010.
Q. How long did you maintain an office at 5010 West Carmen in Tampa?
A. I don't know off the top of my head. I don't know. Somewhere between -- when did I move? -- 2012, maybe. Somewhere either end of 2011, 2012, at some

Page 26

point I moved the office; but I don't know -- I couldn't give you exact date to save my life on that one.
Q. And around that time you moved the office from 5010 West Carmen to what address?
A. To 3902 Henderson.
Q. At what time did you open the West Palm Beach office?
A. Sometime in 2010 or '11.
MS. LOLLIO: Can I mark this, please? Can I just take that sticker?
THE COURT REPORTER: Sure.
(Exhibit 2 marked for identification.)
BY MS. LOLLIO:
Q. Mr. Mader, I'm showing you what's been marked as Mader Exhibit No. 2. Do you recognize this as the petition for permanent injunction, restitution, civil penalties, and other court orders that was filed against you and Mader Law Group?
A. Yes.
Q. And this petition was filed by the State of Missouri.
A. Yes.
Q. Correct?
It was filed through the Missouri Attorney General Office. Correct?

Page 27

A. Yes.
Q. Is it fair for the purpose of today's deposition for me to refer to this as the "Missouri Attorney General lawsuit"?
A. "Missouri complaint" is fine.
Q. "Missouri complaint"?
A. Make it easy on all of us.
Q. Are you familiar with the act -- the lawsuit that the State of Missouri filed against you and Mader Law Group?
A. Yes.
Q. And the Missouri complaint was filed on September 26th, 2012. Is that correct?
A. Yes.
Q. When did any member of the Mader Law Group first become aware that the State of Missouri filed the Missouri complaint that we've marked as Mader Exhibit 2?
A. When I was served.
Q. And when were you served?
A. Sometime after it was filed.
Q. When you say "when I was served," are you referring to yourself, Eric Mader?
A. Yeah, and -- yes.
Q. Would you agree with me that you were served

Page 28

with the Missouri complaint on October 23rd, 2012?
A. Sounds about right.
Q. Do you have any reason to dispute that you were served with the Missouri complaint on October 23rd, 2012?
A. No.
Q. And who at Mader Law Group was served with the petition?
A. I was.
Q. I'm sorry. Let me strike that. Who at Mader Law Group was served with the Missouri complaint?
A. I was.
Q. Do you recall how you were served with the Missouri complaint?
A. No, I don't.
Q. Upon receipt of the Missouri complaint, did you read the Missouri complaint?
A. I scanned it.
Q. Did you read the allegations of the Missouri complaint?
A. Yes.
Q. And you read the Missouri complaint on or before December 20th, 2012. Is that correct?
A. Yes, some -- I guess so.
Q. Do you have any reason to dispute that you --

ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
29–32

Page 29

1      A.  No.
2      Q.  Did anyone on behalf of Mader Law Group have
3  any conversations with the Missouri Attorney General's
4  Office prior to receipt of the Missouri complaint?
5      A.  No.
6      Q.  Did the Missouri Attorney General's Office
7  conduct an investigation of you or Mader Law Group prior
8  to filing the Missouri complaint?
9      A.  I don't know.
10      Q.  Did the Missouri Attorney General's Office
11  advise anyone at Mader Law Group that it was
12  investigating Mader Law Group prior to filing the
13  Missouri complaint?
14      A.  No.
15      Q.  Did anyone on behalf of you or Mader Law Group
16  submit the Missouri complaint to any insurance
17  carrier?
18      A.  I technically did, yes, to Travelers; and then
19  I decided that I didn't need to have it covered at that
20  time.
21      Q.  So you tendered the Missouri complaint to
22  Travelers on behalf of you and Mader Law Group?
23      A.  Yes.
24      Q.  Do you recall when you tendered it to
25  Travelers?

Page 30

1      A.  I don't.  It was in an e-mail to Karin
2  Kuridenhimenmeier, whatever her name is.
3      Q.  Kruidenier?
4      A.  Kruidenier.
5      Q.  K-r-u-i-d-e-n-i-e-r.
6      A.  That's good.
7      Q.  I'm sorry.  You said at some point you decided
8  you didn't need it handled by Travelers?
9      A.  Yes.
10      Q.  Did you withdraw the tender of the Missouri
11  complaint?
12      A.  Yes.
13      Q.  Do you recall when you withdrew it?
14      A.  Couple of weeks after, I guess.
15      Q.  And prior to the time that you withdrew the
16  tender of the Missouri complaint, did Travelers provide
17  you with any --
18      A.  No.
19      Q.  -- correspondence regarding its position
20  regarding the tender?
21      A.  No.
22      Q.  Did anyone on behalf of you or Mader Law Group
23  tender the Missouri complaint to any other insurance
24  carriers?
25      A.  No.

Page 31

1      Q.  Did you maintain any records at Mader Law
2  Group regarding the tender of the Missouri complaint on
3  behalf of you and Mader Law Group to Travelers?
4      A.  There may have been an e-mail, but that's
5  about it.
6      Q.  What was the resolution of the Missouri
7  Attorney General -- excuse me.  What was the resolution
8  of the Missouri complaint against you and Mader Law
9  Group?
10      A.  There's no resolution as of today.
11      Q.  The case remains pending?
12      A.  Yes.
13          (Exhibit 3 marked for identification.)
14  BY MS. LOLLIO:
15      Q.  Mr. Mader, I'm showing you what's been marked
16  as Mader Exhibit No. 3.  Do you recognize this
17  exhibit?
18      A.  No.
19      Q.  And this is a group exhibit comprised of six
20  pages.  Is that correct?
21      A.  One, two, three, four, five, six.
22      Q.  So you do not recognize this exhibit number --
23  excuse me, strike that.
24          You do not recognize Mader Exhibit No. 3 as
25  consumer complaints made against Mader Law Group with

Page 32

1  the Missouri Attorney General?
2      A.  No.
3      Q.  Mader Law Group was aware that there were
4  complaints with the -- consumer complaints made with the
5  Missouri Attorney General.  Correct?
6          MR. SMITH:  Object to form.
7      A.  After I got served, yes.
8  BY MS. LOLLIO:
9      Q.  After you were served with what?
10      A.  The Missouri complaint.
11      Q.  Prior to being served with the Missouri
12  complaint in October of two thousand -- October of 2012,
13  you were not aware of any consumer complaints made
14  against Mader Law Group, were you?
15      A.  We had complaints, yes, but I wasn't
16  specifically aware of these that you laid out here.
17      Q.  What complaints was Mader Law Group aware
18  of?
19      A.  I couldn't give you specifics other than we
20  had some complaints.
21      Q.  How did you receive -- or how did you learn of
22  these complaints?
23      A.  People call in and say, "I'm complaining,"
24  some people did some things on the Better Business
25  Bureau; the normal way.



ERIC A. MADER                                          July 08, 2014
TRAVELERS vs. MADER LAW GROUP                               33—36

Page 33

1    Q.   At any time did the Missouri Attorney
2  General's Office contact you and advise you that there
3  were complaints made by Missouri consumers?
4    A.   No.
5    Q.   All right.  Either clients or former clients
6  had made complaints to Mader Law Group prior to you
7  having been served with the Missouri complaint?
8    A.   One more time?
9    Q.   Either current or former clients made
10 complaints to Mader Law Group prior to the firm's
11 receipt of the Missouri complaint?
12   A.   There -- there probably were complaints.
13   Q.   Are these complaints made to you?
14   A.   Not directly, no.
15   Q.   How did you learn of the complaints?
16   A.   One of the paralegals or somebody over at the
17 other office, you know, may have told me, "Hey, we've
18 got a complaint here.  We need to resolve it."  We had
19 things in place to handle disputes with complainants.
20   Q.   All right.
21        (Exhibit 4 marked for identification.)
22 BY MS. LOLLIO:
23   Q.   All right, Mr. Mader.  I'm showing you what's
24 been marked as Mader Exhibit No. 4, and this is
25 comprised of several pages.  Do you recognize this

Page 34

1  exhibit?
2    A.   I recognize -- I've seen some of these before,
3  yes.
4    Q.   And these are -- the documents contained in
5  Mader Exhibit 4 are items that were produced by Mader
6  Law Group in response to Travelers' request for
7  production of documents.  Is that correct?
8    A.   Yes.
9    Q.   And the documents contained in Mader Exhibit
10 No. 4 are notices of complaints made against you, Eric
11 Mader.  Correct?
12   A.   Correct.
13   Q.   And am I correct in saying that there are six
14 notices of complaints made against Eric Mader in Exhibit
15 No. 4?
16   A.   Yes.
17   Q.   There are six different complainants
18 identified in the documents contained in Mader Exhibit
19 No. 4?
20   A.   Yes.
21   Q.   Each complaint is dated March 2nd, 2012.  Is
22 that correct?
23   A.   Yes.
24   Q.   And each notice is addressed to a Richard
25 Allen Schlosser.  Is that correct?

Page 35

1    A.   I guess, yes.
2    Q.   And the documents contained in Mader Exhibit
3  No. 4 are advising Mr. Schlosser that a complaint by a
4  particular individual is being forwarded to his
5  committee for investigation and appropriate action.  Is
6  that correct?
7    A.   Yes.
8    Q.   And each of the notices contained in Mader
9  Exhibit No. 4 identified potential violations of The
10 Florida Bar rules?
11   A.   Yes.
12   Q.   And you, Eric Mader, are identified or CC'd at
13 the bottom of each of the notices contained in -- let me
14 take that back.  The first five -- strike that.
15        Of the first five notices of complaint
16 contained in Mader Exhibit No. 4, you are CC'd as the
17 recipient of the notice.  Is that correct?
18   A.   Yes.
19   Q.   And the sixth notice, which is dated December
20 13th, 2011, you are a recipient of the notice?
21   A.   Yes.
22   Q.   Okay.  When did Mader Law Group receive notice
23 of the notices of complaints contained in Mader Exhibit
24 4?
25   A.   Within the dated time frame.

Page 36

1    Q.   I'm sorry.  Did you say "within a dated
2  time" --
3    A.   Within the dated time frame.
4    Q.   And what does that mean?
5    A.   If it was March 2nd, I probably got it a week
6  or two later.
7    Q.   And the notices contained in Mader Exhibit
8  No. 4 identify the following individuals as having filed
9  complaints against you.  These include Joy Mohatt,
10 M-o-h-a-t-t; Robert T. Parr; Michael Gonzalez; Yong Hu;
11 Jacob Sartz, and -- is that correct?
12   A.   Yes.
13        (Exhibit 5 marked for identification.)
14        MS. LOLLIO:  I apologize.  I have only one
15   copy of this.  If you want to review it
16   beforehand ...
17        MR. SMITH:  Yes.
18 BY MS. LOLLIO:
19   Q.   Mr. Mader, I'm showing you what's been marked
20 as Mader Exhibit No. 5.  If you could turn to the bottom
21 half of the page, do you recognize that to be an e-mail
22 from you to a Robby Birnbaum?
23   A.   Yes.
24   Q.   And that e-mail is dated March 8th, 2012?
25   A.   Yes, it is.



ERIC A. MADER                                                    July 08, 2014
TRAVELERS vs. MADER LAW GROUP                                         37–40

Page 37

1     Q.   And in this e-mail you state that you have
2   several complaints being reviewed by -- is it Stoker?
3     A.   Uh-huh.
4     Q.   Who is Stoker?
5     A.   I'm assuming it was -- it probably meant
6   "Schlosser."
7     Q.   And in that March 8th, 2012, e-mail, you
8   identify complaints made by Gonzalez, Mohatt, Parr, Hu,
9   and Sartz?
10    A.   Yes.
11    Q.   And these are the notices of complaints that
12  we reviewed in Mader Exhibit No. 4.  Correct?
13    A.   Yes.
14    Q.   And the March 8th, 2012, e-mail, which we've
15  marked as Mader Exhibit No. 5, also states that you are
16  preparing responses to complaints by Fields, Rockingham,
17  Dow, and Philips?
18    A.   Uh-huh.
19    Q.   Is that correct?
20    A.   Yes.
21    Q.   What -- is it your understanding that those
22  were complaints made to The Florida Bar as well?
23    A.   Yes.
24    Q.   So as of March 8th, 2012, you are aware of
25  eight complaints that were made to The Florida Bar

Page 38

1   against you?
2     A.   Yes.
3     Q.   And was Mader Law Group aware of those
4   complaints?
5     A.   Yeah.
6     Q.   Okay.
7     A.   I told myself.
8         (Exhibit 6 marked for identification.)
9   BY MS. LOLLIO:
10    Q.   I'm sorry.  Who is Robby Birnbaum?
11    A.   He was counsel for me with Greenspoon Marder.
12  They're out of Fort Lauderdale.
13    Q.   Mr. Mader, I'm showing you what we've marked
14  as Mader Exhibit No. 6.
15    A.   Yeah.
16    Q.   Do you recognize this exhibit?
17    A.   Oh, yeah.
18    Q.   This exhibit is comprised of several notices
19  of findings of probable cause for future disciplinary
20  proceedings?
21    A.   Yep.
22    Q.   And these notices of probable cause are
23  addressed to -- are filed against you individually.
24  Correct?
25    A.   Yes.

Page 39

1     Q.   When did Mader Law Group receive notice of --
2   and is it fair to call these -- let me strike that.
3         Is it fair to refer to the notices contained
4   in Mader Exhibit 6 as "notices of finding of probable
5   cause"?
6     A.   Yeah, I guess so.
7     Q.   When did Mader Law Group become aware of the
8   notices of finding of probable cause?
9     A.   I don't even know when I got this.  If there's
10  a date in here, then that's probably on the time frame I
11  got.
12    Q.   Prior to your receipt of the notices of
13  finding of probable cause contained in Mader Exhibit No.
14  6, did The Florida Bar perform an investigation into the
15  disciplinary complaints that were made against you?
16        MR. SMITH:  Object to form.
17    A.   Yes.
18  BY MS. LOLLIO:
19    Q.   Did you have any knowledge that The Florida
20  Bar was conducting or performing an investigation of you
21  prior to receipt of the notices contained in Mader
22  Exhibit 6?
23    A.   I'm not sure.  If I got notices of it, then
24  yes; if not, no.
25    Q.   Did you participate or did you receive any

Page 40

1   correspondence from The Florida Bar as part of its
2   investigation of you?
3     A.   Yeah, I'm sure I did at some point.
4     Q.   Do you recall when any of that communication
5   took place?
6     A.   No.
7     Q.   To your knowledge, did The Florida Bar
8   investigate each disciplinary complaint filed against
9   you?
10    A.   I don't think they investigated all of them,
11  no.
12    Q.   Did you have any conversations with anyone
13  concerning the complaints made against you prior to your
14  receipt of any of the notices of complaints in Mader
15  Exhibit 5?
16    A.   One more time, please.  I'm sorry.
17        MR. SMITH:  Let's get the exhibit straight.
18    5 --
19        MS. LOLLIO:  So Exhibit 5, correct.
20  BY MS. BURNS:
21    Q.   I apologize for backing up.  I'm sorry,
22  Exhibit 4.
23    A.   Okay.
24    Q.   Did you have any conversations concerning the
25  complaints identified in Mader Exhibit 4 prior to



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
41–44

Page 41

1  receipt of the notices of complaints?
2      A.  No.
3      Q.  And the four complaints that you reference in
4  Mader Exhibit 5, the four additional complaints --
5      A.  Yes.
6      Q.  -- did you have any conversations with anyone
7  regarding those complaints prior to receipt of notice of
8  those complaints?
9      A.  I don't believe so.
10     Q.  Other than what we've previously marked as
11  Mader Exhibit 4, did The Florida Bar send Mader Law
12  Group any correspondence related to the disciplinary
13  complaints?
14     A.  I don't know.  Normally speaking, when you
15  notice -- the first time you hear about it is when you
16  get noticed, so ...
17     Q.  After that, did The Florida Bar send you any
18  correspondence regarding the complaints?
19     A.  They may have.
20     Q.  Did Mader Law Group or you maintain any
21  correspondence from The Florida Bar related to the
22  complaints made in Mader Exhibit 4 and referenced in
23  Mader Exhibit 5?
24     A.  Only whatever e-mails I have.  I had two
25  hard-drive crashes, so I may have lost a bit of

Page 42

1  information, unfortunately.
2      Q.  When were your hard-drive crashes?
3      A.  In the last year -- in 2012 and '13; more than
4  one.
5      Q.  Did you make a search for any of those
6  e-mails?
7      A.  Yeah, I did a full search for everything as a
8  part of the request for discovery.  I was able to give
9  you whatever I had.
10     Q.  Did anyone at Mader Law Group on your behalf
11  submit the notices of findings of probable cause to any
12  insurance carrier?
13     A.  No.
14     Q.  Did anyone at Mader Law Group on your behalf
15  submit the notices of complaint to any insurance
16  carrier?
17     A.  No.
18     Q.  Did you submit any of the notices of complaint
19  to any insurance carrier?
20     A.  (No audible response.)
21     Q.  Did you submit the notice of --
22     THE COURT REPORTER:  I'm sorry.  I didn't get
23  an answer.
24     A.  No.
25     THE COURT REPORTER:  "No."  Thank you.

Page 43

1      THE WITNESS:  Sorry.
2  BY MS. LOLLIO:
3      Q.  Did you submit -- and I'm sorry.  We could
4  have gone over this before.  You probably reviewed some
5  of the rules with your attorney; but have you given a
6  deposition before?
7      A.  Yeah.
8      Q.  Okay.
9      THE COURT REPORTER:  I'm sorry.  I just wasn't
10  looking at you.
11     THE WITNESS:  That's fine.  It was my fault.
12  BY MS. LOLLIO:
13     Q.  Did you submit personally, individually -- did
14  you submit any of the notices of finding of probable
15  cause to any insurance carrier?
16     A.  No.
17     (Exhibit 7 marked for identification.)
18  BY MS. LOLLIO:
19     Q.  All right.  Mr. Mader, I'm showing you what we
20  have marked as Mader Exhibit No. 7.  Do you recognize
21  this as The Florida Bar complaint filed against you?
22     A.  Unfortunately, yes.
23     Q.  Turning to Page 53 of Exhibit No. 7, do you
24  see the certificate of service which identifies that The
25  Florida Bar complaint was served on October 8th, 2013?

Page 44

1      A.  Yep.
2      Q.  When did you first receive the complaint?
3      A.  This specific complaint?  Probably sometime
4  after that, then.
5      Q.  Prior to receipt of the complaint, did you
6  have any conversations with anyone at The Florida Bar
7  regarding the complaint?
8      A.  Not specifically the complaint as a whole; but
9  certain respondents that were mentioned in it, I'm sure
10  I had conversations with them.
11     Q.  Do you recall having conversations with The
12  Florida Bar regarding certain individuals identified in
13  the complaint?
14     A.  Not specifically; but I'm probably sure I did,
15  yes.
16     Q.  What was the nature of the conversations that
17  you recall having with The Florida Bar prior to receipt
18  of the complaint?
19     A.  Just discussing "There's a complainant, and
20  resolve it, if you can; and give us an answer to why."
21     Q.  And is it your understanding that the
22  complainants identified in The Florida Bar complaint
23  were either former or current clients complaining about
24  legal services that you provided?
25     A.  Yes.



Case 8:13-cv-02577-RAL-TGW   Document 70-1   Filed 01/05/15   Page 13 of 30 PageID 1098

ERIC A. MADER                                                July 08, 2014
TRAVELERS vs. MADER LAW GROUP                                      45–48

Page 45
1    Q.   Did The Florida Bar send Mader Law Group any
2  correspondence prior to filing The Florida Bar
3  complaint?
4    A.   I don't know.
5    Q.   You conducted a search for any correspondence
6  in response to Travelers' request for production of
7  documents?
8    A.   Yes.
9    Q.   Did anyone at Mader Law Group on your behalf
10 submit The Florida Bar complaint to any insurance
11 carrier?
12   A.   No.
13   Q.   Did you submit The Florida Bar complaint to
14 any insurance carrier?
15   A.   No.
16   Q.   What was the resolution of The Florida Bar
17 action against you?
18   A.   Oh, I've got a 91-day suspension.
19   Q.   And are you currently serving that
20 suspension?
21   A.   Yes, I am.
22   Q.   When did that begin?
23   A.   The 18th or 20th of June, somewhere in that
24 area; 18th, 19th.
25   Q.   And this is a 91-day suspension.  Correct?

Page 46
1    A.   Yes.
2    Q.   Let me back up.  I forgot to ask you earlier,
3  are you doing anything in terms of employment at this
4  time?
5    A.   I'm doing a little bit of
6  commercial-collection work, yes.
7    Q.   And are you affiliated with any specific
8  entity, or are you doing this on your own?
9    A.   With MLG Law.
10   Q.   MLG Law?
11   A.   Yes.
12   Q.   Where is MLG Law located?
13   A.   They're based out of D.C., but they have an
14 office in Tampa.
15   Q.   Where is that office located?
16   A.   It's at the same address.
17   Q.   Same address --
18   A.   3902.
19   Q.   3902 Henderson?
20   A.   Yes.
21   Q.   Does MLG stand for something?
22   A.   No.
23   Q.   And when did you start providing collection --
24 commercial-collection work for MLG Law?
25   A.   October of last year.

Page 47
1    Q.   October of 2013?
2    A.   Yes.
3    Q.   So is the -- is it fair to say that The
4  Florida Bar's action against you is fully resolved,
5  other than this 91-day suspension that you are currently
6  serving?
7    A.   And the restitution, yes.
8    Q.   And can you describe for me the restitution?
9    A.   It's about 30K.
10        (Exhibit 8 marked for identification.)
11 BY MS. LOLLIO:
12   Q.   Mr. Mader, I'm showing you what's been marked
13 as Deposition Exhibit 8.  Do you recognize this
14 exhibit?
15   A.   No.
16   Q.   Was Mader Law Group ever made aware that
17 consumer complaints were made against Mader Law Group
18 with the Florida Better Business Bureau?
19   A.   Yes.
20        MR. SMITH:  Object to form.
21   A.   Yes.
22 BY MS. LOLLIO:
23   Q.   When was Mader Law Group first aware that
24 consumer complaints were made against Mader Law Group
25 with the Florida Better Business Bureau?

Page 48
1        MR. SMITH:  Same objection.
2    A.   I don't know specific dates.  Probably same
3  time around -- some -- I don't know.  I know we got
4  them, but I don't know when, so ...
5  BY MS. LOLLIO:
6    Q.   How did Mader Law Group become aware that
7  there were complaints made against Mader Law Group with
8  the Florida Better Business Bureau?
9        MR. SMITH:  Same objection.
10   A.   Either -- either -- either -- I think via --
11 the Better Business Bureau probably noticed us via
12 e-mail or called us at some point would be my guess.
13 BY MS. LOLLIO:
14   Q.   So at some point the Florida Better Business
15 Bureau notified Mader Law Group that consumer complaints
16 were made against Mader Law Group with the Florida
17 Better Business Bureau?
18        MR. SMITH:  Objection.
19   A.   Yes.
20 BY MS. LOLLIO:
21   Q.   You don't recall whether you received
22 notification through e-mail or any other form of
23 correspondence?
24   A.   Yeah, not specifically.  I don't put a lot of
25 credence in the Better Business Bureau.  So we didn't



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
49–52

Page 49

1  necessarily note it to make sure, other than to -- if
2  there's an issue, we try to resolve it.
3     Q.  Do you recall the nature -- I'm sorry.  Other
4  than the Florida Better Business Bureau advising you
5  that there were complaints made regarding Mader Law
6  Group with the Florida Better Business Bureau, did you
7  have any other correspondence or communications with the
8  Florida Better Business Bureau?
9        MR. SMITH:  Same objection.
10    A.  No, not that I know of.
11 BY MS. LOLLIO:
12    Q.  Did the Florida Better Business Bureau on
13 September 23rd, 2012, contact Mader Law Group to request
14 information as to why the business believes the
15 customers are filing complaints and what actions the
16 business has taken to help eliminate causes of the
17 complaints?
18    A.  They may have on that date, I'm not sure.
19    Q.  Do you recall Mader Law Group being contacted
20 by the Florida Better Business Bureau to request
21 information as to why the business believes the
22 customers are filing complaints and what actions the
23 business has taken to help eliminate the complaints?
24    A.  I don't know.
25    Q.  Do you have any reason to dispute that the

Page 50

1  Florida Better Business Bureau requested information
2  from Mader Law Group as to why it believes customers are
3  filing complaints and what action Mader Law Group has
4  taken to help eliminate the causes of the complaints?
5     A.  No.  If somebody contacted us, we're
6  responsive to it.
7     Q.  But you have no reason to dispute that the
8  Florida Better Business Bureau contacted the Mader Law
9  Group to request information?
10    A.  No.  I'm sure they did at some point.
11    Q.  Do you recall whether or not anyone on behalf
12 of Mader Law Group responded to the Florida Better
13 Business Bureau request for information?
14    A.  I'm sure somebody did, but I don't know who it
15 was.
16    Q.  Do you recall whether you provided any
17 information to the Florida Better Business Bureau
18 regarding any complaints?
19    A.  I don't know that -- no, I don't think that
20 was -- I didn't handle a lot of that aspect of it.
21    Q.  Did the Florida Better Business Bureau ever
22 provide Mader Law Group with copies of any of the
23 consumer complaints made to the Florida Better Business
24 Bureau?
25    A.  I don't know.

Page 51

1     Q.  Did anyone on behalf of Mader Law Group submit
2  the consumer complaints made to the Florida Better
3  Business Bureau to any insurance carrier?
4     A.  No.
5     Q.  As we talked earlier today, Mader Law Group
6  provided loan-modification services prior to January
7  2013.  Correct?
8     A.  Yes.
9     Q.  And in January '13 you either stopped taking
10 loan-modification files or closed out the current files
11 that you had remaining?
12    A.  Yes.
13    Q.  Mader Law Group was providing
14 loan-modification work from January 2012 to January
15 2013.  Correct?
16    A.  Yes.
17    Q.  And I know we discussed this earlier, but you
18 can't apportion a certain percentage of Mader Law Group
19 services to loan-modification work?
20    A.  No.
21    Q.  Would you say less than 50 percent?
22    A.  Probably.
23    Q.  Can you describe the loan-modification
24 services that Mader Law Group provided?
25    A.  In depth or -- basically helping customers try

Page 52

1  to achieve a modification of their mortgage.
2     Q.  And Mader Law Group performed foreclosure work
3  from January 2012 to January 2013?
4     A.  (Moves head up and down.)
5     Q.  Can you apportion a certain percentage of the
6  services provided to foreclosure work?
7     A.  No.
8     Q.  Would you say less than 50 percent?
9     A.  Yes.
10    Q.  And could you describe the foreclosure work
11 that Mader Law Group provided?
12    A.  Responding to lis pendens, et cetera, in court
13 on behalf of the client.
14    Q.  Did you individually provide loan-modification
15 and foreclosure work?
16    A.  No.
17    Q.  Who at Mader Law Group provided
18 loan-modification services?
19    A.  Everybody out of the West Palm office.
20    Q.  Anyone at the Tampa office?
21    A.  Loan modification?
22    Q.  Uh-huh.
23    A.  No.  Shannon Hammer did do some
24 loan-modification work.  Well, I take that back.  Did
25 she?  No, no, I don't think she did actually.  She just



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
53–56

Page 53

1    did -- she just assisted with the foreclosure work.
2       Q.   And then who at Mader Law Group provided or
3    performed foreclosure work on behalf of Mader Law
4    Group?
5       A.   John Mitchell.
6       Q.   And Shannon Hammer?
7       A.   She assisted as paralegal, yes.
8       Q.   Anyone else?
9       A.   Nope.
10      Q.   Did Mader Law Group ever register as "doing
11   business as" names?
12      A.   Yes.
13      Q.   And what names did Mader Law Group register as
14   "doing business as" names?
15      A.   Mader & Associates.
16      Q.   At what time did Mader Law Group register as
17   doing business as Mader & Associates?
18      A.   Whatever the time of the filing.
19      Q.   January 10th, 2012, sound accurate?
20      A.   Sure.
21      Q.   Do you have any reason to dispute that you --
22      A.   No.
23      Q.   -- registered those names on January 10th,
24   2012?
25      A.   No.

Page 54

1       Q.   What states did Mader Law Group register as
2    doing business as Mader & Associates?
3       A.   Just one.
4       Q.   Did Mader Law Group ever register as Mortgage
5    Relief Legal Center?
6       A.   We might have.  Well, as a d/b/a?  I don't
7    know.  Is it in there?
8       (Exhibit 9 marked for identification.)
9    BY MS. LOLLIO:
10      Q.   I'm showing you what's been marked as
11   Deposition Exhibit No. 9.  Deposition Exhibit No. 9 is
12   comprised of three pages.  Correct?
13      A.   Yes.
14      Q.   And do you recognize Exhibit No. 9?
15      A.   Yes.
16      Q.   And the first is an application for a
17   registration of fictitious name; and at the bottom, that
18   is signed by you, Eric Mader, on January 10th, 2012.
19   Correct?
20      A.   Which one?  I'm sorry.
21      Q.   The first page?
22      A.   Yes.  Mader & Associates, yes.
23      Q.   And the fictitious name to be registered is
24   Mader & Associates.  Correct?
25      A.   Yeah.

Page 55

1       Q.   Is the second an application for registration
2    of fictitious name for Mader Law & Associates, or is
3    that the third?
4       A.   Yeah, 2009.
5       Q.   And that was filed on December 10th, 2009,
6    with the Secretary of State?
7       A.   Yeah.
8       Q.   And that application was signed by you, Eric
9    Mader, on December 10th, 2009?
10      A.   Yeah -- yes.
11      Q.   Can I see that, please?
12      A.   Sure (handing).
13      Q.   And the third is an application for
14   registration of fictitious name dated October 17th,
15   2012.  Correct?
16      A.   Yes.
17      Q.   All right.  And that is signed by you, Eric
18   Mader, on October 17th, 2012.  Correct?
19      A.   Yes, it is; and I don't remember this one.
20      Q.   All right.  Do you have any reason to -- and
21   the fictitious name to be registered is Mortgage Relief
22   Legal Center.  Correct?
23      A.   Yeah.
24      Q.   Do you have any reason to dispute that you
25   submitted this application and signed for it?

Page 56

1       A.   I don't recall doing this one; so maybe, yes.
2    I know we used the name, but I don't remember filing a
3    d/b/a for it.
4       Q.   Although you don't remember, do you have any
5    reason to dispute that a d/b/a was filed for Mortgage --
6       A.   Not looking at it now, but I don't know that I
7    necessarily was the one that did it, so ...
8       Q.   All right.  And each of the applications for
9    registration of fictitious name contained in Mader
10   Exhibit 9 are filed with the Florida Secretary Of State.
11   Is that correct?
12      A.   Yes.
13      Q.   Did you register any of those "doing business
14   as" names with any other states?
15      A.   No.
16      Q.   Did Mader Law Group ever share office space
17   with American Financial Law Group?
18      A.   Insomuch as that I am also American Financial
19   Law Group, the answer would be yes; but as far as other
20   employees, no.
21      Q.   And that was at 3902 Henderson Boulevard in
22   Tampa, Florida?
23      A.   No.  5010 Carmen.
24      Q.   5010 Carmen.  So you shared office space with
25   American Financial Law Group at 5010 Carmen in Tampa,



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
57—60

Page 57

1 Florida?
2     MR. SMITH: Object to form.
3    A. I don't think "shared" is the correct word to
4 use because AFLG was here, Mader was here. I owned them
5 both, so yes, I shared it; but the businesses were
6 separate.
7 BY MS. LOLLIO:
8    Q. The businesses were separate. Did American
9 Financial Law Group ever -- strike that.
10     Did American Financial Law Group ever maintain
11 an office at 5010 West Carmen in Tampa, Florida?
12    A. Yes.
13    Q. And what time did American Financial Law Group
14 maintain an office at 5010 West Carmen in Tampa,
15 Florida?
16    A. 2009 or '10 going forward.
17    Q. Is it still -- does American Financial Law
18 Group still maintain an office at 5010 West Carmen?
19    A. Yes.
20    Q. And is American Financial Law Group still in
21 existence?
22    A. Yes. It's closing up files. It's almost --
23 almost dead.
24    Q. Do you have plans to dissolve?
25    A. Yes. It will be dead shortly.

Page 58

1    Q. Did Mader Law Group ever share office space
2 with Mader Packer Attorneys at Law?
3    A. Shawn worked out of that office, so yes, I
4 guess we shared office space.
5    Q. Shawn Packer?
6    A. Yes. But that never really amounted to
7 anything; maybe had five files total.
8    Q. And at what office was Mader Packer Attorneys
9 at Law sharing office space with Mader Law Group?
10    A. 3902 Henderson.
11    Q. And prior to its dissolution, Mader Law Group
12 used 3902 Henderson Boulevard in Tampa as an office
13 address. Correct?
14    A. (Moves head up and down.)
15    Q. Prior to moving its office to 3902 Henderson
16 Boulevard, Mader Law Group maintained an office at 5010
17 West Carmen in Tampa, Florida. Correct?
18    A. Yes.
19    Q. Did Mader Law Group ever share office space
20 with Meridian Law Group?
21    A. Again, as much as that I'm also the sole owner
22 of Meridian, I guess we can say yes; but office staff,
23 anybody associated with that worked out of a separate
24 office -- office space.
25    Q. Where did Meridian Law Group maintain an

Page 59

1 office?
2    A. 5010.
3    Q. When you say "as far as office staff worked
4 out of a separate space," what do you mean?
5    A. Exactly that; that anybody that was working on
6 any Meridian files worked in a location -- worked in a
7 different office.
8    Q. But worked in an office located at 5010 --
9    A. 5010 is a large building. It has numerous
10 offices in it.
11    Q. But 5010 West Carmen. Correct?
12    A. Correct.
13    Q. And is Meridian Law Group still in
14 existence?
15    A. Yes.
16    Q. That is separate from MLG Law?
17    A. Yes. Yeah, too many freaking M's.
18    Q. Do you have any plans to dissolve MLG -- I'm
19 sorry, Meridian Law Group?
20    A. It's in its wind-down phase as well, too, and
21 hasn't taken on clients in -- forever.
22    Q. And prior to Meridian Law Group moving offices
23 to 3902 Henderson Boulevard in Tampa, Florida, it
24 maintained an office at 5010 West Carmen. Correct?
25    A. One more --

Page 60

1    Q. Sorry, I sped through that one.
2    A. Yes.
3    Q. Prior to Meridian Law Group moving its office
4 to 3902 Henderson Boulevard, it maintained an office at
5 5010 West Carmen Street in Tampa, Florida. Correct?
6    A. Yes.
7    Q. Bear with me.
8    (Exhibit 10 marked for identification.)
9 BY MS. LOLLIO:
10    Q. Mr. Mader, I'm showing you what's been marked
11 as Mader Deposition Exhibit 10. Do you recognize this
12 to be the policy application for professional liability
13 coverage that Mader Law Group submitted to Travelers for
14 the policy period of March 2013 to March 2014?
15    A. Yes.
16    Q. Can you take a look at Page 5 of Mader Exhibit
17 10?
18    A. Okay.
19    Q. Is that your signature that appears on what's
20 marked Page 5 out of 5 of the application?
21    A. Looks like it.
22    Q. And you signed the application on January
23 15th, 2013. Correct?
24    A. Yes.
25    Q. You sign in your capacity as managing partner



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
61–64

Page 61

1 of Mader Law Group. Is that correct?
2    A.   Yes.
3    Q.   And following -- let me take that back.
4         All right. And included in Mader Exhibit 10
5 there is also a "Lawyers Professional Liability Coverage
6 Bankruptcy & Collection Supplement" that is attached to
7 the application. Is that correct? Do you see that?
8    A.   Looks like it, yes.
9    Q.   Can you turn to Page 3 of the lawyers
10 professional liability coverage bankruptcy and
11 collections supplement?
12    A.   I think I can.
13    Q.   This is the first page of the supplement. It
14 will probably be at the end of the exhibit. Do you see
15 it?
16    A.   This is 3 of 5 right here.
17    Q.   It's actually --
18         MR. SMITH: The first part -- the last couple
19    of pages.
20    A.   Here we go, yep. Okay.
21 BY MS. LOLLIO:
22    Q.   At the bottom of the page, it's marked Page 3
23 of 3. Correct?
24    A.   Yep. That's my signature.
25    Q.   So you signed the supplement --

Page 62

1    A.   Yes.
2    Q.   -- on January 17th, 2013 --
3    A.   Yes.
4    Q.   -- as managing partner of Mader Law Group.
5 Correct?
6    A.   Yes.
7    Q.   Turning back to the application, the first
8 five pages, is it fair to say this is an amended
9 application that contains some changes to the original
10 application?
11    A.   Yes.
12    Q.   And the items that were changed on the amended
13 application include the answer to Question No. 5, the
14 names of the attorneys associated with the firm, which
15 is on Page 1.
16    A.   Yes.
17    Q.   Correct?
18    A.   Yes.
19    Q.   And the items changed on the amended
20 application also include the answer to Question No. 13,
21 the gross revenue amounts for the applicable fiscal
22 year, that is on Page 3.
23    A.   Yes.
24    Q.   Correct?
25    A.   Yes.

Page 63

1    Q.   Okay. The items changed on the amended
2 application include the answer to Question No. 19, the
3 percentage of outstanding billings over 90 days past
4 due. Correct?
5    A.   Yes.
6    Q.   And next to each -- do you see any other
7 changes in the amended application?
8    A.   No.
9    Q.   And next to each of these changes, the
10 question in No. 5 -- the answer to Question No. 5, the
11 answer to Question No. 13, and the answer to Question
12 No. 19 -- do you see the initials G.A./E.M. and the date
13 2/27/13?
14    A.   Yes.
15    Q.   Who is G.A.?
16    A.   I don't know.
17    Q.   And E.M. is you?
18    A.   E.M. would be me; but I don't remember G.A. I
19 don't know who G.A. is. And yes, E.M. I guess would be
20 me; yes.
21    Q.   Did you make the changes to the policy
22 application that we see in the amended application?
23    A.   It looks like -- in 13, 19, and No. 5?
24    Q.   Uh-huh, yes.
25    A.   It doesn't look like my handwriting.

Page 64

1    Q.   Did you sign for the changes to the policy
2 application --
3    A.   I signed the policy.
4    Q.   Correct. The actual changes to Questions No.
5 5, 13, and 19, did you sign for those changes?
6    A.   That's not my -- I don't know if that is or is
7 not my initials on it.
8    Q.   Did you review the changes to the policy
9 application reflected in the answers to Questions 5, 13,
10 and 19?
11    A.   I don't remember if I reviewed them or not.
12         And I see -- and I probably need to amend my
13 previous answer. Stacey Steuer has been working as our
14 bookkeeper, as a part-time bookkeeper; and she assisted
15 with the filing of this as an employee of Mader Law, up
16 until October of last year as well.
17    Q.   So Stacey Steuer, S-t-e-u-e-r, was an employee
18 of Mader Law Group?
19    A.   E-u-e-r, by the way.
20    Q.   Did I not say that?
21    A.   Yeah.
22    Q.   Okay. She was an employee of Mader Law
23 Group?
24    A.   Yes.
25    Q.   And she was a bookkeeper in the Tampa



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
65–68

Page 65

1  office?
2      A.  Well, she didn't work out of that office, but
3  she came in, yes.
4      Q.  She was employed by the firm until October
5  2013?
6      A.  Yes.
7      Q.  All right.
8      A.  And she did assist with this policy.
9      Q.  So other -- not looking at the three changes
10  that were made to Questions 5, 13, and 19 --
11      A.  Yeah.
12      Q.  -- who completed the policy application?
13      A.  I ultimately signed it.  Stacey may have
14  assisted me in filling out some of it.
15      Q.  Considering you're the managing partner, you
16  were authorized by Mader Law Group to sign the policy
17  application on behalf of Mader Law Group?
18      A.  Yes.  I authorized myself.
19      Q.  Did you provide Stacey Steuer with authority
20  to fill in some of the answers that are contained on the
21  policy application?
22      A.  I must have.
23      Q.  Did you personally complete or fill in any of
24  the information that is included on the application?
25      A.  Yes; parts of it, yes.

Page 66

1      Q.  Do you recall what specific parts?
2      A.  No.
3      Q.  Did Stacey Steuer consult with you prior to
4  completing any portion of the application?
5      A.  Maybe.  I don't remember.
6      Q.  You reviewed the application before signing
7  it.  Correct?
8      A.  "Reviewed" is a strong term, but I probably
9  scanned over it and put my name on it.
10      Q.  You looked at the policy application before
11  you signed it?
12      A.  Yes, I looked at it.
13      Q.  Did you have any discussions with any firm
14  employees before signing the policy application?
15      A.  I'm sure I talked briefly with Stacey over
16  information that needed to get on it.
17      Q.  And other than Stacey, did you have any
18  discussions with any other employees at Mader Law Group
19  prior to signing the application?
20      A.  No.
21      Q.  You did not change any of the information
22  contained in the policy application before signing.
23  Correct?
24      A.  Other than maybe scratching out that name
25  there.  I may have done that on the first page.

Page 67

1      Q.  The name -- it's hard to read that's scratched
2  off there -- Shawn Packer?
3      A.  I don't think that is Shawn Packer.  I don't
4  know who that was.  It might be.  But yeah.
5      Q.  Other than scratching out the name that is
6  identified as attorneys associated with the firm in
7  response to Question No. 5, you did not make any changes
8  to the policy application before signing it.  Is that
9  correct?
10      A.  You know, I think I know who G. -- who -- G.A.
11  is Gayle Haase.  It's not G.A.  It's G.H.  And she's
12  a -- commercial Travelers.  And I don't believe that
13  G.A. -- and the E.M., I don't know that that's my
14  signature on that.
15      Q.  Gayle Haase works for Travelers, or does she
16  work for an insurance agency?
17      A.  I guess she works for an insurance agency on
18  behalf of Travelers.
19      Q.  Do you know which insurance agency she works
20  with?
21      A.  I don't remember.
22          MS. LOLLIO:  Can you go back to my last
23      question a few questions ago about changes to the
24      policy application?  I don't believe I got an
25      answer to that question.

Page 68

1          THE COURT REPORTER:  "Question:  Other than
2      scratching out the name that is identified as
3      attorneys associated with the firm in response to
4      Question No. 5, you did not make any changes to the
5      policy application before signing it.  Is that
6      correct?"
7      A.  I guess it is; yes, I guess.
8  BY MS. LOLLIO:
9      Q.  That's correct?
10      A.  I guess, yes.  You know, I don't -- I guess
11  yes.
12      Q.  There are also two pages attached to the
13  amended application.
14      A.  Yep.
15      Q.  The first of the two pages is titled "Mader
16  Law Group Responses to Open Questions."
17      A.  Yes.
18      Q.  Is that correct?
19      A.  Yes.
20      Q.  And it's dated February 26th, 2013?
21      A.  Yes.
22      Q.  Who prepared this document?
23      A.  I don't know.
24      Q.  Did you prepare this document on behalf of
25  Mader Law Group?



ERIC A. MADER                                                        July 08, 2014
TRAVELERS vs. MADER LAW GROUP                                              69–72

Page 69

1    A.  I may have, I don't know.
2    Q.  Did you approve the information identified on
3 this page?
4    A.  Yes.
5    Q.  Do you know why the page titled "Mader Law
6 Group Response to Open Questions" was added to the
7 amended application?
8    A.  No.
9    Q.  The second of the two pages attached to the
10 amended application is titled, quote, "Option Choice."
11 Is that correct?
12   A.  Yes.
13   Q.  Who prepared this?
14   A.  I don't know.
15   Q.  Did you prepare this on behalf of Mader Law
16 Group?
17   A.  I don't think so.
18   Q.  Did you approve the information contained on
19 the page titled, quote, "Option Choice"?
20   A.  I don't know.
21   Q.  Do you know why this page was added to the
22 amended application?
23   A.  I don't.
24       MR. SMITH:  Object to form.
25 BY MS. LOLLIO:

Page 70

1    Q.  All right.  Can you please turn to Page 4 of 5
2 of the application.
3    A.  First application or the second application?
4    Q.  It doesn't matter.
5    A.  Okay.
6    Q.  Let's just go with the second application.
7    A.  All right.
8    Q.  That seems to be the most final.
9    A.  Okay.
10   Q.  So turn to Page 4 of 5, please.
11   A.  Sure.
12   Q.  Do you see Question No. 25 on that page?
13   A.  Yes.
14   Q.  And the question reads, "Has any attorney in
15 your firm ever had a disciplinary complaint filed with
16 any court, administrative agency, or regulatory body or
17 been disbarred, suspended, reprimanded, sanctioned, or
18 held in contempt?"  Do you see that question?
19   A.  Yes.
20   Q.  And the box next to that question is checked
21 with -- "no" with an X.  Is that correct?
22   A.  Yes.
23   Q.  That was a sloppy question, so let me re-ask
24 it.  The box next to Question No. 25 is checked "no"
25 with an X.  Correct?

Page 71

1    A.  Yes.
2    Q.  Who placed the X in that box?
3    A.  I don't know.
4    Q.  You reviewed this question and answer prior to
5 signing the application.  Is that correct?
6    A.  I assume I did.
7    Q.  Did you have any discussions with any
8 employees of Mader Law Group regarding Question No. 25
9 before signing the application?
10   A.  No.
11   Q.  Did you have any discussions with any
12 insurance agents regarding Question No. 25 before --
13   A.  No.
14   Q.  -- signing the application?
15   A.  No.
16   Q.  All right.  On the same page, do you see
17 Question No. 26?
18   A.  Yes.
19   Q.  And that question reads, "During the past
20 seven years, has any professional liability claim or
21 suit been made or brought against your firm, a
22 predecessor firm, or any current or former firm member?"
23 Do you see that question?
24   A.  Yes.
25   Q.  And the box next to Question 26 is checked

Page 72

1 "no" with an X.  Correct?
2    A.  Yes.
3    Q.  Do you know who put an X in that box?
4    A.  I'm assuming I may have, but I don't know 100
5 percent.
6    Q.  And you reviewed this question and answer
7 prior to signing the application.  Correct?
8    A.  I scanned it, yes.
9    Q.  You reviewed the question and answer prior to
10 signing the application?
11   A.  I scanned/reviewed, yes.
12   Q.  Did you have any discussions with any
13 employees at Mader Law Group regarding Question No. 26
14 before signing the application?
15   A.  No.
16   Q.  Did you have any discussions with any
17 insurance agents regarding Question No. 26 before
18 signing the application?
19   A.  No.
20   Q.  On the same page, immediately below, do you
21 see Question No. 27 immediately following Question No.
22 26?
23   A.  Yes.
24   Q.  That question reads, "Do you or any member or
25 employee of your firm have knowledge of any incident,



Case 8:13-cv-02577-RAL-TGW   Document 70-1   Filed 01/05/15   Page 20 of 30 PageID 1105

ERIC A. MADER                                                    July 08, 2014
TRAVELERS vs. MADER LAW GROUP                                       73—76

Page 73

1    act, error, or omission that is or could be the basis of
2    a claim under this proposed professional liability
3    policy?"  Do you see that question?
4        A.   Yes.
5        Q.   And the box next to Question No. 27 is checked
6    "no" with an X.  Correct?
7        A.   Correct.
8        Q.   Do you know who placed the X in that box?
9        A.   Same answer.
10       Q.   And "same answer" being?
11       A.   I don't know for 100 percent.  Probably was
12   me.
13       Q.   You reviewed this question and answer prior to
14   signing the application.  Correct?
15       A.   Yes, I reviewed/scanned it.
16       Q.   Prior to signing the application?
17       A.   Prior to signing, yes.
18       Q.   Did you have any discussions with any
19   employees at Mader Law Group prior to signing the
20   application with respect -- excuse me, strike that.
21           Did you have any conversations with any
22   employees of Mader Law Group regarding Question No. 27
23   before signing the application?
24       A.   No.
25       Q.   Did you have any discussions with any

Page 74

1    insurance agents regarding Question No. 27 prior to
2    signing the application?
3        A.   No.
4        Q.   Mader Law Group knew about the Missouri
5    Attorney General lawsuit, which we previously discussed
6    as the "Missouri complaint," at the time that you
7    completed the application.  Correct?
8        A.   Yes.
9        Q.   The firm did not identify the Missouri
10   Attorney General lawsuit in the application.  Is that
11   correct?
12       A.   Correct.
13       Q.   The Missouri Attorney General lawsuit was not
14   identified on the policy application in response to
15   Question No. 26.  Correct?
16       A.   Correct.
17       Q.   The Missouri Attorney General lawsuit, which
18   we previously discussed as the "Missouri complaint," was
19   filed within seven years prior to Mader Law Group's
20   completion of the policy application on January 15th.
21   Is that correct?
22       A.   Yes.
23       Q.   Is it Mader Law Group's contention that the
24   answer to Question No. 26 is correct given that the
25   Missouri Attorney General lawsuit had been filed against

Page 75

1    the firm prior to completing the application?
2        A.   Yes.
3        Q.   What is the basis of Mader Law Group's
4    contention that the answer to Question No. 26 is
5    correct?
6        A.   I felt at the time it wasn't germane to what
7    was going on, and I didn't intend to have Travelers
8    assist with it.
9        Q.   Is the only basis of your contention that the
10   answer to Question No. 26 is correct because you felt
11   the Missouri Attorney General lawsuit was not germane to
12   what was going on, and you did not intend to have
13   Travelers cover it?
14       A.   And I just didn't even think there was -- I
15   didn't think it was part of what they were asking.  At
16   the time it seemed like a frivolous suit.
17       Q.   At that time you had filed an answer to the
18   Missouri Attorney General lawsuit.  Correct?
19       A.   I don't know if I -- yeah, I guess I did
20   answer to it, I think.  Maybe.  I don't know when I did
21   file answer to that.
22       Q.   You agree that the Missouri Attorney General
23   lawsuit is based on professional services that you or
24   Mader Law Group provided?
25           MR. SMITH:  Object to form.

Page 76

1        A.   I don't know what the basis of it is -- BS
2    complaint -- but there was -- it was against me and the
3    firm.
4    BY MS. LOLLIO:
5        Q.   Is it your understanding that the Missouri --
6    the allegations made in the Missouri Attorney General
7    lawsuit arose from professional services that you or
8    Mader Law Group provided?
9        A.   I guess, yes.
10       Q.   The Missouri Attorney General lawsuit was not
11   identified in response to Question No. 27.  Is that
12   correct?
13       A.   Correct.
14       Q.   Is it your contention that the answer to No.
15   27 is correct?
16       A.   Yes.
17       Q.   What is the basis of your contention that the
18   answer to No. 27 is correct?
19       A.   Again, I didn't think it was germane; I didn't
20   think that lawsuit had any validity; and I wasn't
21   planning on having Travelers be involved with them.
22       Q.   Could you turn to the Missouri complaint we
23   previously marked --
24           THE WITNESS:  Could we take a quick break?
25   I'm thirsty, and I need to use the restroom.



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
77—80

Page 77

1      MS. LOLLIO:  That's fine.
2      MR. SMITH:  Is there a question pending?
3      MS. LOLLIO:  I just asked him to turn to the
4   complaint, so that's fine.
5      (Recess from 10:39 a.m. to 10:46 a.m.)
6   BY MS. LOLLIO:
7      Q.   So do you have exhibit -- Mader Exhibit No. 2
8   in front of you?  That's the Missouri complaint.
9      A.   Yes.
10     Q.   Can you turn to Pages 12 and 13 of the
11  complaint?  First turn to Page 12.
12     A.   Yes.
13     Q.   Do you see the section titled "Consumer
14  Example"?
15     A.   Yes.
16     Q.   And underneath that section titled "Consumer
17  Example," there are paragraphs numbered 41 through 45
18  which contain allegations that Ms. Sherri Gibson
19  retained Mader Law Group for loan-modification services;
20  that she paid Mader Law Group a retainer fee; and made
21  mortgage payments to Mader Law Group instead of to the
22  mortgagee.  Is that correct?
23     A.   Yes.
24     Q.   Is it your contention that individuals such as
25  Ms. Gibson would not have a future claim against you?

Page 78

1      A.   Can you be more specific?
2      Q.   As of the time that you completed the policy
3   application in January 2013, is it your contention that
4   Ms. Gibson would not have a claim against Mader Law
5   Group or you?
6      MR. SMITH:  Object to form.
7      A.   I didn't think that it was a valid complaint.
8   BY MS. LOLLIO:
9      Q.   What factual information did you have as of
10  January 15th, 2013, that Ms. Gibson would not have an
11  action or claim against you or Mader Law Group?
12     A.   I don't know off the top of my head.
13     Q.   Did you have any factual information as of
14  January 15th, 2013, that Ms. Gibson did not have an
15  action or claim against you or Mader Law Group?
16     A.   Other than the agreement that she signed,
17  retainer she signed, being a non-made guaranteed
18  contract -- or non-guaranteed contract, that was the
19  extent of it.
20     Q.   So it's your contention that Ms. Gibson would
21  not have an action or claim against you or Mader Law
22  Group because of the terms of the retainer agreement?
23     A.   Yes; and the -- I didn't believe the State of
24  Missouri had jurisdiction either.
25     Q.   Jurisdiction?

Page 79

1      A.   Against either myself or Mader Law Group.
2      Q.   Mader Law Group knew about The Florida Bar
3   notices of complaints at the time that you completed the
4   application on January 15th, 2013?
5      A.   Yes.
6      Q.   The firm's not identified The Florida Bar
7   notices of complaints in the application.  Is that
8   correct?
9      A.   Correct.
10     Q.   The Florida Bar discipline -- excuse me.  The
11  Florida Bar notices of complaints were not identified in
12  response to Question No. 25.  Is that correct?
13     A.   Right.
14     Q.   Is it Mader Law Group's contention that the
15  answer to Question No. 25 is correct given The Florida
16  Bar notices of complaints made against you?
17     A.   Yes.
18     Q.   What is the basis of the -- of Mader Law
19  Group's contention that the answer to Question No. 25 is
20  correct?
21     A.   I didn't think it was germane to the coverage;
22  and again, it was still pending, so I had faith that
23  the -- that I would get resolved without any issue.
24     Q.   So the basis for your contention that the
25  answer to Question No. 25 in consideration of The

Page 80

1   Florida Bar notices of complaints made against you is
2   correct is that you did not think that the complaints
3   made against you were germane to coverage?
4      A.   Yes.
5      Q.   And the complaints were pending at the time
6   that you completed the application?
7      A.   Yeah.  And I didn't even think that I would
8   ask the -- for coverage by Travelers on them.
9      Q.   You agree that The Florida Bar is a regulatory
10  body?
11     A.   Yes.
12     Q.   Do you agree that each notice of complaint is
13  a document advising you that a complaint has been made
14  against you for an alleged violation of The Florida Bar
15  rules?
16     A.   Yes.
17     MR. SMITH:  Object to form.
18     A.   Yes.
19  BY MS. LOLLIO:
20     Q.   You agree that the complaints made by former
21  and current clients to The Florida Bar that we
22  previously discussed during today's deposition were for
23  the purpose of investigating you?
24     A.   Yes.
25     Q.   The notices of the -- well, in general, The



ERIC A. MADER                                                                    July 08, 2014
TRAVELERS vs. MADER LAW GROUP                                                        81–84

Page 81
1  Florida Bar complaints made against you were not
2  identified in response to Question No. 26.  Is that
3  correct?
4      A.  Correct.
5      Q.  The Florida Bar complaints that were made
6  against you were made seven years prior to Mader Law
7  Group's completion of the policy application on January
8  15th.  Correct?
9      A.  Correct.
10     Q.  Is it Mader Law Group's contention that the
11  answer to Question No. 26 is correct given The Florida
12  Bar complaints made against you?
13     A.  Yes.
14     Q.  What is the basis of Mader Law Group's
15  contention that the answer to Question No. 26 is correct
16  given The Florida Bar complaints made against you?
17     A.  I didn't think it was a professional liability
18  claim, and it wasn't a lawsuit.
19     Q.  You agree that the complaints made against you
20  to The Florida Bar were complaints made by former or
21  current clients regarding services that you provided.
22     A.  Yes.
23     Q.  Correct?
24         The complaints made against you with The
25  Florida Bar were not identified in response to Question

Page 82
1  No. 27.  Is that correct?
2      A.  Yes.
3      Q.  What -- is it Mader Law Group's contention
4  that the answer to Question No. 27 is correct?
5      A.  Yes.
6      Q.  What is the basis of Mader Law Group's
7  contention that the answer to No. 27 is correct?
8      A.  I didn't believe it was part of professional
9  liability.
10     Q.  Is it your contention that none of the
11  individuals who filed complaints against you with the
12  Florida Better Business Bureau -- excuse me, strike
13  that.
14         Is it your contention that none of the
15  complaints made against you with the Florida Better
16  Business Bureau would give rise to claims against you in
17  the future?
18     A.  Yes.  I put no stock in the Better Business
19  Bureau.
20     Q.  I apologize.  Let me take that back.  Is it
21  your contention that none of the complaints made against
22  you to The Florida Bar would give rise to claims against
23  you or the firm in the future?
24     A.  Florida Bar?
25     Q.  Correct.

Page 83
1      A.  Yes.
2      Q.  What factual information did you have as of
3  January 15th, 2013, that none of the individuals who
4  filed complaints with the Florida Better -- Florida
5  Bar -- strike that.  Let me start over.
6         What factual information did you have as of
7  January 15th, 2013, that none of the individuals who
8  filed complaints against you with The Florida Bar were
9  going to make a claim against you or the firm?
10     A.  I didn't think it would go that way.
11     Q.  Did you have any factual information as of
12  January 15th, 2012 (sic), that none of the individuals
13  who filed complaints against you with The Florida Bar
14  were going to make a claim against you?
15     A.  Other than the belief that I didn't think they
16  were valid.
17     Q.  Mader Law Group knew about the Florida Better
18  Bureau complaints when completing the application on
19  January 15th, 2013.  Correct?
20     A.  To some degree, yes.
21     Q.  The Florida Better Business Bureau complaints
22  were not identified in response to Question No. 26.  Is
23  that correct?
24     A.  That's correct.
25     Q.  The Florida Better Business Bureau complaints

Page 84
1  were made within seven years prior to Mader Law Group's
2  completion of the policy application on January 15th,
3  2013.  Is that correct?
4      A.  Correct.
5      Q.  Is it Mader Law Group's contention that the
6  answer to No. 26 is correct in consideration to the
7  complaints made against the firm with the Florida Better
8  Business Bureau?
9      A.  Yes.
10     Q.  What is the basis of the firm's contention
11  that the answer to Question No. 26 is correct?
12     A.  It had nothing to do with the professional
13  liability claim, and it was not a lawsuit.
14     Q.  You agree that the complaints made to the
15  Florida Better Business Bureau were made by former or
16  current clients regarding services that Mader Law Group
17  provided?
18     A.  One more time, please?  I'm sorry.
19     Q.  Do you agree that the complaints made to the
20  Florida Better Business Bureau included complaints by
21  former or current clients regarding services that Mader
22  Law Group provided?
23     A.  Yes.
24     Q.  The Florida Better Business Bureau complaints
25  were not identified in response to Question No. 27.  Is



Case 8:13-cv-02577-RAL-TGW   Document 70-1   Filed 01/05/15   Page 23 of 30 PageID 1108

ERIC A. MADER                                          July 08, 2014
TRAVELERS vs. MADER LAW GROUP                               85–88

Page 85

1  that correct?
2    A.  Yes.
3    Q.  Is it Mader Law Group's contention that the
4  answer to No. 27 is correct in view of the Florida
5  Better Business Bureau complaints?
6    A.  Yes.
7    Q.  What is the basis of Mader Law Group's
8  contention that the answer to No. 27 is correct?
9    A.  It had nothing to do with the proposed
10  professional liability.
11    Q.  When you say "proposed professional
12  liability," what are you referring to?  The proposed --
13  the policy --
14    A.  What the question is asking, I didn't think it
15  applied to that.
16    Q.  Is it your contention that none of the Florida
17  Better Business Bureau complaints would give rise to
18  claims against you or the Mader Law Group in the
19  future?
20    A.  Yes.
21    Q.  What is the basis of that contention?
22    A.  It's the Better Business Bureau.  They're not
23  even a real entity.
24    Q.  What factual information did you have as of
25  January 15th, 2013, that none of the individuals who

Page 86

1  filed complaints with the Florida Better Business Bureau
2  were going to make a claim against you or Mader Law
3  Group?
4    A.  Other than they signed a non-guaranteed
5  contract, and we were handling everything in-house if
6  there was a complaint.
7    Q.  I'm sorry.  What was that last part?
8    A.  We were handling everything in-house on any
9  complaints anyhow.
10    Q.  Did you have any other factual information as
11  of January 15th, 2013, that none of the individuals who
12  filed complaints with the Florida Better Business Bureau
13  were going to make a claim against Mader Law Group or
14  any of its attorneys?
15    A.  I don't know.
16    Q.  You don't know?
17    A.  I don't know off the top of my head right now,
18  no.
19    Q.  Is it fair to say as of right now you don't
20  know of any -- you don't know whether you had any other
21  factual information as of January 15th, 2013?
22    A.  I may have, but I don't know right now.
23    Q.  Mader Law Group contends that it performed
24  loan-modification work for the year preceding January
25  15th, 2013.  Correct?

Page 87

1    A.  Yes.
2    Q.  Did Mader Law Group identify its
3  loan-modification work on the policy application?
4    A.  I don't think so.
5    Q.  None of Mader Law Group's loan-modification
6  work was identified in response to Question No. 10 on
7  the policy application.  Correct?
8    A.  Correct.
9    Q.  Is it Mader Law Group's contention that the
10  answer to Question No. 10 was correct?
11    A.  Yes.
12    Q.  What is the basis for Mader Law Group's
13  contention that the answer to Question No. 10 was
14  correct?
15    A.  There wasn't a spot for it.
16    Q.  Why did Mader Law Group not include
17  loan-modification work in the category titled "other"
18  listed in Question No. 10?
19    A.  I don't know why it didn't.
20    Q.  Mader Law Group performed foreclosure work in
21  the year preceding January 15th, 2013.  Correct?
22    A.  Correct.
23    Q.  None of Mader Law Group's foreclosure work was
24  identified in response to Question No. 10 in the policy
25  application.  Correct?

Page 88

1    A.  Correct.
2    Q.  Is it Mader Law Group's contention that the
3  answer to Question No. 10 is correct?
4    A.  Yes.
5    Q.  What is the basis for Mader Law Group's
6  contention that the answer to Question No. 10 is
7  correct?
8    A.  Again, it wasn't -- there wasn't a line for
9  it.
10    Q.  Why did Mader Law Group not include
11  foreclosure work in the category titled "other" and
12  listed in Question No. 10?
13    A.  Didn't think it applied.
14    Q.  As we discussed earlier today, Mader Law Group
15  had at least three "doing business as" names on file
16  with the State of Florida when completing the policy
17  application on January 13th -- 15th, 2013.  Correct?
18    A.  Yes.
19    Q.  Mader Law Group did not identify any of the
20  "doing business" names in response to Question No. 3 of
21  the policy application.  Correct?
22    A.  Yes.
23    Q.  Is it the firm's contention that the answer to
24  Question No. 3 is correct?
25    A.  Yes.



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
89—92

Page 89

1    Q.   What is the basis for Mader Law Group's
2  contention that the response to Question No. 3 was
3  accurate?
4         MR. SMITH:  Pardon me just -- I want to object
5    to the form of the question.  The exhibit you've
6    handed me has no answer.
7         MS. LOLLIO:  Okay.
8  BY MS. LOLLIO:
9    Q.   You agree that there is no response to
10  Question No. 3.  Correct?
11    A.   Correct, yes.
12    Q.   Would you agree or is it Mader Law Group's
13  contention that not providing any information in
14  response to Question No. 3 is an accurate response to
15  the question?
16    A.   Yes, because I considered everything as "Mader
17  Law Group," even though we had other names.
18    Q.   You agree that Question No. 3 on the policy
19  application asks for "firm, trade, or 'doing business
20  as' name."  Correct?
21    A.   Yes.
22    Q.   Mader Law Group maintained offices at the same
23  addresses as American Law Group, Mader Packer Attorneys
24  at Law, and Meridian Law Group.  Is that correct?
25    A.   No.  It's American Financial Law Group.

Page 90

1    Q.   American Financial Law Group?
2    A.   Yes.
3    Q.   Mader Law Group shared -- excuse me.
4         Mader Law Group maintained offices at the same
5  address as American Financial Law Group, Mader Packer
6  Attorneys at Law, and Meridian Law Group.  Is that
7  correct?
8    A.   Same addresses, not necessarily the same
9  offices.
10    Q.   Mader Law Group did not identify American
11  Financial Law Group, Mader Packer Attorneys at Law, or
12  Meridian Law Group in response to Question No. 20.  Is
13  that correct?
14    A.   Yes, I think it is No. 20.
15    Q.   And is it Mader Law Group's contention that
16  the answer to Question No. 20 was accurate?
17    A.   Yes.
18    Q.   What is the basis for Mader Law Group's
19  contention that the response to Question No. 20 was
20  accurate?
21    A.   I didn't think it was germane to the policy
22  coverage; and in terms of sharing office space, it was
23  the same address, not necessarily the same office.
24    Q.   Is it Mader Law Group's contention that the
25  policy application is ambiguous?

Page 91

1    A.   Yes.
2    Q.   How is the policy application ambiguous?
3    A.   Wasn't clear, and I didn't understand it.
4    Q.   What about the policy application is not
5  clear?
6    A.   The questions as they were stated.
7    Q.   Which questions are not clear?
8    A.   The ones that are in dispute.
9    Q.   So it's your contention that Questions 25, 26,
10  27, 20, 10, and 3 are not clear?
11    A.   Yes.
12    Q.   At any time did you contact Travelers or
13  Travelers insurance agency that you referred to earlier
14  in assistance in completing the policy application?
15    A.   No, I don't think so.
16         (Exhibit 11 marked for identification.)
17  BY MS. LOLLIO:
18    Q.   I'm showing you what's been marked as Mader
19  Exhibit No. 11.  Do you recognize Mader Exhibit No. 11
20  as the Florida Attorney General complaint made against
21  Mader Law Group?
22    A.   Yes.
23    Q.   When did Mader Law Group receive the Florida
24  Attorney General complaint?
25    A.   Sometime in August.

Page 92

1    Q.   August?
2    A.   2012 or '13, I'm not sure.  '12?
3    Q.   August of 2012?
4    A.   I think so.  It wasn't last year, was it?
5  August -- I honestly don't know.  It was in August
6  because I wasn't home at the time, so ...
7         I guess it was this last year, so August of
8  2013.
9    Q.   So Mader Law Group was served with the Florida
10  Attorney General complaint in August of 2013.
11  Correct?
12    A.   Either August or early November when we were
13  actually served, yes.
14    Q.   Did you read the allegations of the Florida
15  Attorney General complaint?
16    A.   Yes.
17    Q.   When did you read the complaint?
18    A.   Sometime after I received it.
19    Q.   Did Mader Law Group request that Travelers
20  provide Mader Law Group and you with a defense to the
21  Florida Attorney General suit after receiving the
22  complaint?
23    A.   Yes.
24    Q.   And sometime after you requested that
25  Travelers provide Mader Law Group and you with a defense



Case 8:13-cv-02577-RAL-TGW   Document 70-1   Filed 01/05/15   Page 25 of 30 PageID 1110

ERIC A. MADER                                                    July 08, 2014
TRAVELERS vs. MADER LAW GROUP                                        93—96

Page 93
1  to the Florida Attorney General lawsuit, you received a
2  letter from Karin Kruidenier of Travelers addressed to
3  you and Mader Law Group.  Is that correct?
4      A.  I think so.
5      Q.  Is it your understanding that you received a
6  reservation-of-rights letter from Karin Kruidenier on
7  behalf of Travelers sent to Mader Law Group and you?
8      A.  Yes.
9      Q.  Is it your understanding that the
10  reservation-of-rights letter pertained to the Florida
11  Attorney General lawsuit?
12      A.  Yes.
13      Q.  Did the Florida Attorney General's Office
14  publicly announce that it was investigating Mader Law
15  Group in 2011?
16      A.  Publicly?  I don't know.
17      Q.  Based on Mader Law Group's answer to
18  Travelers' complaint in this action admitting that the
19  Florida Attorney General's Office publicly announced it
20  was investigating Mader Law Group in 2011, would you
21  agree that the Florida Attorney General's Office
22  publicly announced it was investigating Mader Law
23  Group --
24      A.  Yes, I guess publicly -- I don't know if they
25  blasted the media, but they did start I guess at that

Page 94
1  point.
2      Q.  Mader Law Group knew in 2011 it was being
3  investigated by the Florida Attorney General's Office?
4      A.  We were in discussions with them, yes.
5      Q.  When did Mader Law Group first learn of the
6  Florida Attorney General's investigation?
7      A.  We had subpoenas filed at some point in 2011,
8  I guess.
9      Q.  And what were those subpoenas for?
10      A.  I don't know.  It was something to do with --
11  it was a request because of websites that were put up,
12  or a website that was put up.
13      Q.  Did the Florida Attorney's General Office
14  request information from Mader Law Group related to its
15  investigation?
16      A.  Yes.
17      Q.  Do you recall when?
18      A.  Throughout -- from that time frame on.
19      Q.  Is it fair to say that that time frame began
20  in 2011?
21      A.  (Moves head up and down.)
22      Q.  Can you describe the requests?
23      A.  No.  It was just a lot.  They requested the
24  information.
25      Q.  Requested information regarding Mader Law

Page 95
1  Group?
2      A.  Yes.
3      Q.  And regarding you individually?
4      A.  Yes.
5      Q.  Did you and Mader Law Group provide
6  information or documents in response to the Florida
7  Attorney General's request?
8      A.  Yes.
9      Q.  What type of information did you and Mader Law
10  Group provide?
11      A.  The client information, services rendered.
12      Q.  Anything else?
13      A.  I'm sure there were quite a bit of other
14  stuff.  I don't remember off the top of my head anything
15  exact, what we -- what we gave them.
16      Q.  Did the Florida Attorney General's Office
17  communicate with Mader Law Group regarding its
18  investigation?
19      A.  Yes.
20      Q.  When?
21      A.  When we got the subpoena or sometime after
22  that we had ongoing communication through counsel.
23      Q.  Who at Mader Law Group communicated with the
24  Florida Attorney General's office?
25      A.  I utilized Greenspoon Marder as my counsel to

Page 96
1  communicate with them.
2      Q.  So all communications with the Florida
3  Attorney General's Office concerning its investigation
4  of you and Mader Law Group were through your counsel?
5      A.  Yes.
6      Q.  Can you describe any of the communications
7  between your counsel and the Florida Attorney General's
8  Office?
9      A.  It's privileged.
10          MS. LOLLIO:  Object to form.
11          You can describe them in a generic nature,
12      but --
13  BY MS. LOLLIO:
14      Q.  Can you describe them in a generic nature
15  without revealing --
16      A.  Just request for information, et cetera.
17      Q.  So you and Mader Law Group were aware that the
18  Florida Attorney General was investigating Mader Law
19  Group at the time that Mader Law Group completed its
20  application on January 15th, 2013.  Correct?
21      A.  Yes.
22      Q.  The investigation was not identified in
23  response to Question No. 27 on the application.
24  Correct?
25      A.  Correct.



Case 8:13-cv-02577-RAL-TGW   Document 70-1   Filed 01/05/15   Page 26 of 30 PageID 1111

ERIC A. MADER                                                  July 08, 2014
TRAVELERS vs. MADER LAW GROUP                                      97–100

Page 97

1    Q.   Is it Mader Law Group's contention that the
2 answer to Question No. 27 was correct in consideration
3 of the Florida Attorney General's investigation of Mader
4 Law Group?
5    A.   Yes.
6    Q.   What is the basis for that contention?
7    A.   I didn't think it was specifically regarding
8 professional liability at the time.
9        MR. SMITH:  That was to Question 27?  Is that
10    what you asked?
11       MS. LOLLIO:  Yes.
12 BY MS. LOLLIO:
13    Q.   Earlier you testified that it was your
14 understanding that the complaints made against you --
15 excuse me, strike that.
16       What factual information did you have as of
17 January 15th, 2013, that the Florida Attorney General
18 investigation would not give rise to a claim against
19 Mader Law Group or any of the attorneys of the firm?
20    A.   Again, I didn't think they had jurisdiction;
21 and I was handling it through counsel at the time.
22    Q.   You did not think that the State of Florida
23 had jurisdiction?
24    A.   Yeah.
25    Q.   And, I'm sorry, the second reason why you did

Page 98

1 not --
2    A.   I was handling the work through counsel.
3    Q.   You were handling the Florida Attorney General
4 investigation through your counsel?
5    A.   Yes.
6    Q.   And that -- did you have any other factual
7 information as to why the Florida Attorney General's
8 investigation would not result in a claim or lawsuit
9 against the firm or you?
10    A.   Again, I didn't think it was professional
11 liability that it fell under.
12    Q.   Would you agree that the Florida Attorney
13 General's investigation was made -- strike that.
14       Would you agree that the Florida Attorney
15 General's investigation arose from services that Mader
16 Law Group and you provided to current or former clients?
17    A.   Yes.
18       (Exhibit 12 marked for identification.)
19 BY MS. LOLLIO:
20    Q.   I'm showing you what's been marked as Mader
21 Exhibit 12.  Do you recognize Mader Exhibit 12 as the
22 summons and complaint filed by Marc Rowe and Tasha Rowe
23 against Mader Law Group and Eric Mader?
24    A.   Yes.
25    Q.   And the complaint is filed against Mader &

Page 99

1 Associates, which we've already discussed was a d/b/a of
2 Mader Law Group.  Correct?
3    A.   Yes.
4    Q.   When did Mader Law Group first receive this
5 Rowe complaint?
6    A.   I don't even know.  Probably somewhere after
7 it was filed.
8    Q.   And it was filed on July 11th, 2013?
9    A.   Yeah.
10    Q.   Did you read the Rowe complaint?
11    A.   Yes.
12    Q.   Did you read the allegations of the
13 complaint?
14    A.   I scanned through it, yes.
15    Q.   All right.  When did you read the complaint?
16    A.   Sometime after receiving it.
17    Q.   And did Mader law firm request that Travelers
18 provide Mader Law Group and you with a defense to the
19 Rowe lawsuit?
20    A.   Yes.
21    Q.   Sometime after Mader Law Group requested that
22 Travelers provide you and Mader Law Group with a defense
23 to the Rowe lawsuit, you received a letter from Karin
24 Kruidenier on behalf of Travelers addressed to you and
25 Mader Law Group.  Correct?

Page 100

1    A.   I think so.
2    Q.   And Karin Kruidenier sent you and Mader Law
3 Group a reservation-of-rights letter on behalf of
4 Travelers.  Is that correct?
5    A.   Yes.
6    Q.   And is it your understanding that the
7 reservation-of-rights letter that Karin Kruidenier
8 sent -- excuse me, strike that.
9       It is your understanding that the
10 reservation-of-rights letter that Karin Kruidenier sent
11 to Mader Law Group and you was made on behalf of
12 Travelers.  Correct?
13    A.   Yes.
14    Q.   And it's your understanding that the
15 reservation-of-rights letter pertained to the Rowe
16 lawsuit.  Correct?
17    A.   Yes.
18    Q.   All right.
19       (Exhibit 13 marked for identification.)
20 BY MS. LOLLIO:
21    Q.   I'm showing you what's been marked as Mader
22 Exhibit 13.  Do you recognize this as a letter to you
23 and Mader Law Group from Karin Kruidenier on behalf of
24 Travelers dated October 4th, 2013?
25    A.   Yes.



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
101–104

Page 101

1    Q.   Who at Mader Law Group received this letter?
2    A.   I did.
3    Q.   In this letter Travelers advised that it was
4  rescinding the policy based on misrepresentations,
5  omissions, concealments of fact, and/or incorrect
6  statements in the policy application.  Is that
7  correct?
8    A.   Yes.
9    Q.   Travelers returned a policy-premium check to
10  you -- excuse me.
11       Travelers returned the policy premium to you
12  in a check form with this October 4th, 2013, letter.
13  Correct?
14    A.   Yes; I don't think it was the full amount, but
15  yes.
16    Q.   Why is it that you do not believe it was the
17  full amount?
18    A.   I thought we had paid more than what they
19  returned back.
20    Q.   Do you have any factual information or
21  documentation that you did not receive the full amount
22  of the policy premium?
23    A.   I haven't looked into exact amounts paid
24  versus what was returned.
25    Q.   Travelers sent you a check for the policy

Page 102

1  premium in the amount of $3,217.22.  Is that correct?
2    A.   Yes.
3    Q.   Who at Mader Law Group received the
4  premium-returned check?
5    A.   I did.
6    Q.   And what did Mader Law Group do with the
7  policy-premium-returned check?
8    A.   Nothing.
9    Q.   So where is that check at this time?
10    A.   Sitting on my desk.
11    Q.   Okay.
12       MS. LOLLIO:  Do you have any questions?
13  Otherwise, I just need to take a short break before
14  continuing, then.  I'm almost done.
15       MR. SMITH:  I don't think I have any
16  questions, but I'll consider that while you take
17  your break.
18       MS. LOLLIO:  Okay.
19       Can we take a quick break?
20       THE COURT REPORTER:  Uh-huh.
21       (Recess from 11:24 a.m. to 11:37 a.m.)
22  BY MS. LOLLIO:
23    Q.   Mr. Mader, I just have a few additional
24  questions before we finish.
25       (Exhibit 14 marked for identification.)

Page 103

1  BY MS. LOLLIO:
2    Q.   I'm showing you what I've marked as Mader
3  Exhibit No. 14.  These are the responses to Plaintiff's
4  first request for production of documents to Defendants.
5  Is this Mader Law Group's and your responses to
6  Travelers' request for production of documents?
7    A.   Yes.  Sorry.
8    Q.   Oh, no, that's okay.  And is this a full and
9  complete copy of Mader Law Group's and your responses to
10  Travelers' request for production of documents?
11    A.   Yes.
12    Q.   Was anything withheld from production in
13  response to Travelers' request for production of
14  documents?
15    A.   Not knowingly.
16    Q.   Was everything in Mader Law Group's and your
17  possession or control produced in response to Travelers'
18  request for production?
19    A.   Everything that I was able to find in my
20  e-mails, et cetera, yes.
21    Q.   Did you review the policy application or any
22  questions in the policy application with Sean Batcheler
23  prior to signing it?
24    A.   No.
25    Q.   Did you obtain any information necessary to

Page 104

1  complete the policy application from Sean Batchler?
2    A.   No, I didn't speak to him at all about it.
3    Q.   I want to turn back to -- I don't recall which
4  one this is, the Mader consumer complaints.  I believe
5  that was Mader Exhibit No. --
6    A.   This one?
7    Q.   No.  Mader Exhibit 3.
8    A.   Right.
9    Q.   You had testified that you have not seen these
10  consumer complaints before.  Correct?
11    A.   I don't remember seeing them.  I could have
12  come across them at some point given --
13    Q.   You were aware that the Missouri Attorney
14  General's lawsuit, which we previously discussed as the
15  "Missouri complaint," arose from complaints made by
16  Missouri consumers?
17    A.   Well, actually, I knew it only came from that
18  one complainant listed on the -- in the suit.
19    Q.   Gibson?
20    A.   Yeah.  That was the only one I saw, that I
21  knew about it.
22    Q.   After you received the Missouri complaint, did
23  you -- were you advised by the Missouri Attorney General
24  that there were consumer complaints made against you and
25  the firm?



ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
105–108

Page 105

1    A.   Just based on the -- well, they didn't advise
2  me one way or the other.  They just filed the suit.
3    Q.   Other than the Gibson complaint, which is
4  referenced in the Missouri complaint --
5    A.   Uh-huh.
6    Q.   -- were you aware that any Missouri consumers
7  filed complaints against you or the firm with the
8  Missouri Attorney General's Office?
9    A.   I -- at the time, no.
10    Q.   "At the time" meaning?
11    A.   When I got the suit, I didn't pay attention to
12  that.
13    Q.   After you were served with the Missouri
14  complaint, were you made aware that consumers had filed
15  complaints with the Missouri Attorney General's
16  Office?
17    A.   I don't think I was made aware specifically,
18  other than once we -- they just said this is -- one
19  client was the basis for their complaint.
20    Q.   And the "one client" you're referring to is
21  Ms. Gibson?
22    A.   Yes.
23    Q.   Directing your attention to Mader Exhibit 6,
24  so the notices of finding of probable cause that we
25  previously discussed --

Page 106

1    A.   Uh-huh.
2    Q.   -- do you see with respect to each notice that
3  there is a file number referenced at the top of each
4  notice?
5    A.   Yes.
6    Q.   And each file number contains a 2011 or 2012
7  heading.  Correct?
8    A.   Or '13, yes.
9    Q.   Is it your understanding that the 2011 or
10  2012 -- or, excuse me, that the notices of finding
11  containing -- notices of finding of probable cause
12  containing a 2011 or 2012 heading arose from complaints
13  made in 2011 or 2012?
14    MR. SMITH:  Object to form.
15    A.   I guess so, yes.
16  BY MS. LOLLIO:
17    Q.   You were aware of some of the complaints which
18  gave rise to the notice of finding of probable cause
19  prior to completing the policy application on January
20  15th, 2013.  Correct?
21    A.   For complaints from?
22    Q.   To The Florida Bar?
23    A.   Yes.
24    MS. LOLLIO:  All right.  That's all I have for
25  right now.

Page 107

1    THE WITNESS:  Okay.
2    MR. SMITH:  We have no questions.
3    MS. LOLLIO:  Okay.  Could we go off the record
4  for a second?
5    THE COURT REPORTER:  We're off the record.
6    (Recess from 11:46 a.m. to 11:47 a.m.)
7    MS. LOLLIO:  Back on the record.
8    The parties had a brief discussion regarding
9  the deposition of Eric A. Mader which was
10  re-noticed for today, July 8th, 2014.  Because
11  Mr. Mader -- excuse me.
12    Because Mr. Mader is the person at Mader Law
13  Group who has all the knowledge -- or most
14  knowledge regarding the matters at issue in this
15  case and has testified already based on his
16  personal knowledge and involvement in this case, in
17  an effort to avoid wasting time for all parties
18  involved, Mr. Mader has stipulated that his
19  testimony given today on behalf of Mader Law Group
20  in response to the 30(b)(6) deposition re-notice
21  will stand as both the testimony on behalf of Mader
22  Law Group and also his own individual testimony as
23  a fact witness.
24    Is that agreeable?
25    MR. SMITH:  Go ahead.

Page 108

1    THE WITNESS:  Yes.
2    MS. LOLLIO:  All right.  That's it.
3    THE WITNESS:  Okay.
4    THE COURT REPORTER:  Read or waive?  Would you
5  like to read the deposition?
6    MR. SMITH:  I think we should read.
7    THE COURT REPORTER:  Sure.
8    And did you need to order it?
9    MS. LOLLIO:  Yes, please.
10    THE COURT REPORTER:  Ten business days
11  sufficient?  That's our normal turnaround.
12    MS. LOLLIO:  That's fine.  I may need to
13  contact you.  We have a discovery cutoff.  Ten
14  business days would take us to where?
15    THE COURT REPORTER:  The 22nd.
16    MS. LOLLIO:  That's fine.  I'll contact you if
17  we need it sooner.
18    THE COURT REPORTER:  Did you need a copy,
19  Mr. Smith?
20    MR. SMITH:  Yes.
21    (The reading and signing of this deposition is
22  not waived, and the taking of this deposition
23  concluded at 11:50 a.m.)
24
25



Page 109

DEPOSITION ERRATA SHEET

Our Assignment No. 158470

Case Caption: Travelers vs. Mader Law Group

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

______________________________
ERIC A. MADER

Page 110

DEPOSITION ERRATA SHEET
ESQUIRE JOB NO. 158470

Page No._____Line No._____Change to:_______________
_______________________________________________
Reason for change:_______________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Reason for change:_______________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Reason for change:_______________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Reason for change:_______________________________
Page No._____Line No._____Change to:_______________
_______________________________________________

SIGNATURE:_______________________DATE:___________
ERIC A. MADER

Page 111

DEPOSITION ERRATA SHEET
ESQUIRE JOB NO. 158470

Page No._____Line No._____Change to:_______________
_______________________________________________
Reason for change:_______________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Reason for change:_______________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Reason for change:_______________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Page No._____Line No._____Change to:_______________
_______________________________________________
Reason for change:_______________________________
Page No._____Line No._____Change to:_______________
_______________________________________________

SIGNATURE:_______________________DATE:___________
ERIC A. MADER

Page 112

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, Jennifer Figueroa, Registered Professional Reporter, certify that I was authorized to and did stenographically report the foregoing deposition, Pages 1 through 108; and that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 14th day of July, 2014.

Jennifer Figueroa
Jennifer Figueroa, RPR

ERIC A. MADER
TRAVELERS vs. MADER LAW GROUP

July 08, 2014
113

Page 113

```
 1                    CERTIFICATE OF OATH

 2

 3      STATE OF FLORIDA

 4      COUNTY OF HILLSBOROUGH

 5

 6           I, Jennifer Figueroa, Registered Professional

 7      Reporter, Notary Public, State of Florida, certify that

 8      ERIC A. MADER personally appeared before me on the 8th

 9      day of July, 2014 and was duly sworn.

10

11           WITNESS my hand and official seal this 14th

12      day of July, 2014.

13

14      Identification:

15      Personally known __ or produced identification X.

16      Type of identification produced:

17      Florida driver's license.

18

19

20           Jennifer Figueroa
             _____
21           Jennifer Figueroa, RPR
22           Notary Public, State of Florida
             Commission No.: EE 848734
23           Commission Expires: 03/02/2017

24

25
```

